SURAMERICANA de ALEACIONES LA-MINADAS, C.A., Conductores de Alumino del Caroni, C.A., Industria de Conductores Electricos, C.A., and Corporacion Venezolana de Guayana, Plaintiffs,

v.

UNITED STATES, U.S. International Trade Commission, and U.S. Department of Commerce, Defendants,

and

Southwire Company, Defendant–Intervenor.

Court No. 88–09–00726.

United States Court of International Trade.

Aug. 22, 1990.

Arnold & Porter (Patrick F.J. Macrory, Nancy C. Loeb, Michael Faber); of counsel, Shelley R. Slade; Shearman & Sterling (Thomas B. Wilner, Jeffrey M. Winton), Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen.; David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice (M. Martha Ries); Joseph I. Liebman, Atty. in Charge, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice; Lynn M. Schlitt, Gen. Counsel, U.S. International Trade Com'n; Robert H. Brumley, Gen. Counsel, U.S. Dept. of Commerce, Washington, D.C., for defendants.

Wigman & Cohen (Victor M. Wigman, Ralph C. Patrick, Dorothy H. Patterson, Arlington, Va.); McKenna, Conner & Cuneo (Peter Buck Feller, Lawrence J. Bogard), Washington, D.C., for defendant-intervenor.

Baker & McKenzie (William D. Outman II, Arthur L. George), Washington, D.C., for Gen. Elec. Co. amicus curiae in support of plaintiffs.

OPINION

MUSGRAVE, Judge.

This case is a clear example of misapplication, indeed misuse, of the Trade Agreements Act by a single litigant that has sought, and here seeks, to obtain relief solely for its own benefit. The statutes involved do not contemplate such private litigation; in fact, they prohibit such actions. The statutes provide for relief to a domestic industry, not a lone member of that industry. Notwithstanding the defendants' strained interpretations of certain decisions of this Court involving facts significantly different from those presented here, three considerations are completely dispositive of this case: the statutes involved, the decision of this Court in *Gilmore Steel v. United States*, 7 CIT 219, 585 F.Supp. 670 (1984), and the decision of the Court of Appeals for the Federal Cir-

cuit in *Oregon Steel Mills v. United States*, 862 F.2d 1541 (1988).

In 1979, Congress amended the 1930 Tariff Act, by adding, *inter alia*, sections 1671a(b)(1) and 1673a(b)(1) of U.S.C. Title 19, to mandate that all antidumping and countervailing duty petitions be brought "on behalf of" a United States domestic industry. In *Gilmore*, the Court of International Trade explicitly recognized that the language in those sections requires a petitioner for the imposition of such duties to show that a majority of its industry supports its petition.

In the instant case, unlike the cases relied upon by defendants, the views of every member of the petitioner's industry were known, and not a single member supported the petition other than the petitioner itself. Nevertheless, to maintain its action in the face of the statutory requirements of industry support, the petitioner, and the other defendants herein, essentially argue that the statutes and *Gilmore* do not really require a finding of industry support for a petition, but only a finding that a majority of the relevant domestic industry does not *oppose* the petition. This contention is completely inconsistent with the express language of the applicable statutes and the holding in *Gilmore*. The petitioner—a fifty-percent owner of the respondent Suramericana (which respondent is a plaintiff herein) for ten of the twelve years prior to the petitioner's action targeting Suramericana—clearly was acting alone and not on behalf of a domestic industry in filing its petition. The petition therefore was improper and the ensuing investigation is a nullity; consequently, the agency determinations resulting therefrom must be vacated.

## BACKGROUND

Plaintiffs Suramericana de Aleaciones Laminadas, C.A. ("Sural"), Conductores de Alumino del Caroni, C.A. ("Condal"), and Industria de Conductores Electricos, C.A. ("Incon") are Venezuelan companies that produce electrical conductor aluminum redraw rod ("EC rod"); plaintiff Corporacion Venezolana de Guayana ("CVG") is a Venezuelan Government development authority that operates as a holding company for Venezuela's two primary aluminum producers. (All of the above are hereinafter referred to as "plaintiffs".) Plaintiffs commenced this action to contest affirmative antidumping and countervailing duty determinations of Commerce and the ITC covering exports to the United States of EC rod from Venezuela. Plaintiffs seek from this Court, on various bases, an order reversing those affirmative determinations and vacating antidumping and countervailing duty orders already outstanding on imports from Venezuela of the subject product.

This request is opposed by defendants the United States, the U.S. International Trade Commission ("ITC") and the Department of Commerce ("Commerce"), and by defendant-intervenor Southwire Company, which company was the original petitioner in the administrative proceedings that resulted in the determinations challenged here.

In challenging the affirmative determinations and the outstanding orders, plaintiffs assert the existence of several procedural and substantive flaws in the administrative proceedings and resulting determinations below. Plaintiffs allege that the finding by the ITC of a threat of injury to United States producers of like products from imports from Venezuela of EC rod was "based in part on last-minute allegations submitted in violation of the [ITC's] Rules and without opportunity for rebuttal." Plaintiffs' Memorandum in Support of Motion for Judgment on the Administrative Record ("Plaintiffs' Brief") at 39. Plaintiffs also argue that the affirmative threat-of-injury determination is "erroneous as a matter of law" in that the supporting factual findings allegedly are conjectural and therefore "insufficient as a matter of law". *Id.* at 43–70. Finally, plaintiffs argue that "[Commerce's] finding that Sural's sales were made at less-than-fair-value prices was incorrect" in that Commerce allegedly improperly rejected information supplied by Sural, relying instead on "best information available" ("BIA"), and made "additional clerical and factual errors." *Id.* at 70–84.

As a precursor to these arguments, however, plaintiffs argue that the administrative record reveals that the antidumping and countervailing duty petitions at issue here were not filed by Southwire "on behalf of" the relevant domestic industry as required by the applicable statutes, and that the petitions therefore were improperly considered by Commerce and the ITC. The Court finds that the petition was not filed on behalf of the relevant domestic industry as required by the statutes, 19 U.S.C. §§ 1671a(b)(1) and 1673a(b)(1); therefore, it is not necessary to discuss further the plaintiffs' other challenges.

### Administrative Procedures

Two agencies are principally involved in the administration of the United States countervailing and antidumping duties laws—the Department of Commerce and the International Trade Commission. Commerce generally determines whether or not goods imported into the United States have been subsidized or sold in the United States at less than their fair value ("dumped"). The ITC determines whether any subsidies or dumping found by Commerce harm or threaten existing or potential U.S. industry. The procedures by which the two agencies make these determinations may be summarized as follows.

When a petition seeking the imposition of antidumping or countervailing duties is filed with Commerce and the ITC by an "interested party", "on behalf of an industry", Commerce must within 20 days determine whether the petition "alleges the elements necessary for the imposition of [such duties] and contains information reasonably available to the petitioner supporting those allegations". If that first determination is affirmative, Commerce must commence an investigation to determine whether in fact a subsidy has been provided to the particular imported merchandise or whether the merchandise in fact is being, or is likely to be, sold in the United States at less than its fair value, so as in part to require the imposition of countervailing or antidumping duties to offset, respectively, the subsidies or the dumping. If the first determination is negative, Commerce must

dismiss the petition and terminate the proceeding. Commerce is required to notify the ITC immediately of any determination it makes under the above procedures, and if the determination is affirmative Commerce must "make available to the [ITC] such information as it may have relating to the matter under investigation...." 19 U.S.C. §§ 1671a, 1673a (1990).

Within 45 days after the date on which a petition is filed or on which Commerce notifies the ITC that it is commencing an investigation, and unless Commerce has dismissed the petition because of a negative determination as to the sufficiency of the allegations in the petition, the ITC must determine preliminarily whether there is a "reasonable indication" that "an industry in the United States" is "materially injured" or "threatened with material injury" by reason of the allegedly subsidized or dumped imports, or whether "the establishment of an industry" in the United States is "materially retarded" thereby. Within 85 days after the filing of the petition or the commencement by Commerce of an investigation (in countervailing duty cases; within 160 days in antidumping cases), but only after an affirmative preliminary determination by the ITC of the existence or threat of material injury or material retardation, Commerce must make a preliminary determination of whether there is a "reasonable basis to believe or suspect" that a subsidy is being provided with respect to the imported merchandise or that the merchandise is being, or is likely to be, sold in the United States at less than its fair value. 19 U.S.C. §§ 1671b, 1673b.

Within 75 days after the date of its preliminary determination described in the preceding paragraph, Commerce must make a final determination of whether or not a subsidy is being provided with respect to the imported merchandise or whether that merchandise is being, or is likely to be, sold in the United States at less than its fair value. If Commerce's determination is affirmative, then Commerce must "make available to the [International Trade] Commission all information upon which such determination was based and which the

Commission considers relevant to its determination." *Id.* §§ 1671d(a), (c)(1), 1673d(a), (c)(1).

The ITC must make a final determination of whether an industry in the United States is suffering, or threatened with, material injury, or whether the establishment of such an injury is materially retarded, by reason of those subsidies or sales at less than fair value. If Commerce's preliminary determination is affirmative, then the ITC must make its final determination before the 120th day after Commerce's preliminary determination. If Commerce's preliminary determination is negative, and its final determination is affirmative, then the ITC must make its final determination within 75 days after Commerce's affirmative final determination. *Id.* §§ 1671d(b), 1673d(b). If the final determinations of Commerce and the ITC are both affirmative, then Commerce must issue a countervailing or antidumping duty order. If either of the final determinations is negative, the investigation must be terminated. *Id.* §§ 1671d(c)(2), 1673d(c)(2).

### Proceedings Below

The ITC described the product at issue in this action as, "certain electrical conductor aluminum redraw rod ... provided for in item 618.15 of the Tariff Schedules of the United States ...", and further, as "compris[ing] wrought rods of aluminum ... which are electrically conductive and contain not less than 99 percent of aluminum by weight." ITC Final Determination, Adm.Rec., List 1, Doc. No. 115, at 1 & n. 3. In response to a petition filed by defendant-intervenor Southwire on July 14, 1987, Commerce commenced an investigation of imports of the product to the United States from Venezuela to determine whether, as Southwire alleged, those imports were unfairly subsidized by the Venezuelan Government in violation of U.S. countervailing duties laws and were exported to the United States at less-than-fair-value

prices in violation of U.S. antidumping laws. On June 30, 1988, Commerce issued final affirmative determinations in both the dumping and the countervailing duty investigations, finding a dumping margin of 5.8 percent and a subsidy rate of 38.4 percent.[1] On August 5, 1988, the ITC issued its final injury determination[2] (hereinafter referred to as "ITC Determination"). The ITC unanimously determined that the domestic U.S. EC rod manufacturing industry was not materially injured by imports of EC rod from Venezuela. ITC Determination at 3. By a four-to-two vote, however, the ITC determined that there was a *threat* of material injury to the domestic industry from EC rod imports from Venezuela.

Plaintiffs contest the validity of those findings and argue that under the facts of this case, neither of the findings shows that Venezuelan rod enjoyed a price advantage in the U.S. market. Plaintiffs' Brief at 29. Plaintiffs argue that the dumping margin found resulted solely from Commerce's wrongful rejection of data submitted by Sural concerning Sural's sales and from Commerce's consequent use of the "best information available" mechanism for determining the "fair value" of those sales. Plaintiffs also argue that the subsidy found by Commerce to have been received by Plaintiffs "provided no actual benefit to Venezuelan exporters", because the program at issue allegedly has the purpose and effect only of partially offsetting for Venezuelan exporters certain exchange rate restrictions maintained by the Venezuelan Government. *Id.* at 29–30.

Defendants contend that Commerce was justified in using BIA because plaintiffs failed to provide Commerce with certain requested information and because certain of the information submitted by Sural allegedly was incomplete or unverifiable. Defendant's Brief at 36–8.

---

1. *Certain Electrical Conductor Aluminum Redraw Rod From Venezuela*—Final Affirmative Antidumping Determination, 53 Fed.Reg. 24,755; Final Affirmative Countervailing Duty Determination, 53 Fed.Reg. 24,763 (June 30, 1988).

2. *Certain Electrical Conductor Aluminum Redraw Rod From Venezuela,* USITC Public'n No. 2103, Investig'n Nos. 701–TA–287 and 731–TA–378 (Aug. 17, 1988).

As noted above, plaintiffs contest the affirmative threat-of-material-injury determination as being based in part on last-minute allegations of Southwire, accepted by the ITC in violation of its own Rules and to which plaintiffs had no opportunity to respond; plaintiffs also contend that the information relied on by the ITC in reaching the determination is insufficient as a matter of law to support that determination.

On the threshold issue of the standing of petitioner Southwire to initiate and pursue the petition in this case, Commerce stated that it "relies upon the petitioner's representation that [the petitioner] has filed 'on behalf of' the domestic industry until it is affirmatively shown that a majority of the members of the relevant domestic industry opposes the petition." 53 Fed.Reg. at 24,-764. At the outset of Commerce's investigation, Reynolds Aluminum, a member of the domestic industry, wrote to Commerce stating that Reynolds took no position with respect to Southwire's petition. One week later the respondents before the agency requested that Commerce dismiss Southwire's petition for lack of standing, alleging that the petition was not brought "on behalf of" domestic industry. Thereafter during Commerce's investigation, another member of the domestic industry, Alcoa Conductor Products Company (ACPC), a division of the Aluminum Company of America (ALCOA), sent to the agency several letters stating that ACPC did not support Southwire's petition and that Southwire "did not speak on behalf of or represent [ACPC] in the proceeding", and requesting that the agency "canvass the views" of other domestic industry members to determine "whether they in fact support Southwire"; ALCOA responded to subsequent inquiries from Commerce regarding the nature and extent of its business activities, including its production of redraw rod in the United States and its percentage share of the U.S. market. *Id.* Shortly after the ACPC correspondence, Commerce received a letter from the Aluminum Trades Council opposing Southwire's petition, "because jobs may be jeopardized as a result of a lack of availability of aluminum rod" resulting from antidumping or coun-

tervailing duties. *Id.* Commerce also received a letter from the Aluminum, Brick and Glass Workers International Union similarly opposing Southwire's petition.

In the face of those communications, Commerce stated that it does not consider as constituting opposition to a petition any of the following: opposition from the respondent in the investigation; a statement of a member of the domestic industry that it takes no position concerning the petition; and opposition from "an entity that is not a member of the domestic industry, *e.g.*, the letter from the Aluminum Trades Council". *Id.* at 24,756. Thus, the Department apparently disregarded for purposes of the "standing" issue all of the above communications except for the notifications of opposition sent by ACPC/ALCOA and the Aluminum, Brick and Glass Workers Union. Because ACPC/ALCOA was found not to represent a majority of the domestic industry, however, and because the union reportedly did not respond to a Commerce inquiry as to the union's proportion of representation of the domestic industry, Commerce determined that there did not exist *opposition* to the petition on the part of a majority of what Commerce deemed to be the domestic industry. Therefore, in accordance with its stated practice of assuming the accuracy of petitioners' assertions of standing absent affirmative contrary indications by a majority of the domestic industry, Commerce declined to investigate further whether the petition was brought "on behalf of" the domestic industry. *Id.*

Plaintiffs again raised the issue of standing before the ITC. In its investigation, and unlike Commerce, the ITC *did* survey the domestic industry to determine the amount of industry support for Southwire's petition. The ITC questionnaire requested the recipients to indicate, by placing a check mark in the appropriate box, whether they supported the petition, opposed it, or took neither position. Of the six U.S. producers of aluminum rod listed and surveyed by the ITC (the entire "domestic industry" as determined by the ITC), only one, Southwire, which brought the petition, indicated that it supported the petition.

One of the other five, ALCOA, representing sixteen percent of total U.S. production, affirmatively opposed the petition, while the remaining four, cumulatively representing fifty percent of domestic production responded that they did not wish to take a position regarding the petition. Thus, the petition was affirmatively supported by 34 percent of the domestic industry by percentage of production and 16.6 by percentage of producers (the percentages represented by Southwire alone); the petition was affirmatively opposed by 16 percent of the industry production and 16.6 percent of the producers (represented by ALCOA); and no position was taken by 50 percent of the industry production and 66.6 percent of the producers. *See* ITC Staff Report, Adm.Rec., List 2, Doc. 21 at A–24. These figures apparently do not include non-manufacturing industry members such as the Aluminum, Brick and Glass Workers Union or the Aluminum Trades Council, both of which opposed the petition before Commerce.

The issue of standing is nowhere discussed in the majority decision of Commissioners Cass, Lodwick, and Rohr in the ITC's Final Determination. Commissioner Cass addressed the issue in his "Additional Views" to the majority's determination, which views he expressed separately because the issue of standing had "not been addressed by the majority." Final Determination at 19. In his discussion of the issue, Commissioner Cass pointed out that the "on behalf of" requirement "has been interpreted to mean that a Petition must be supported by a majority of the production of the domestic like product." *Id.* at 20 (citing *Gilmore Steel*). He then noted,

> Petitioner Southwire Company has been unable to enlist the support of any other member of the industry, and one manufacturer has expressed its opposition to the petition. Southwire alone does not

represent a majority of domestic production of EC rod.

*Id.* (citations omitted).[3] On the facts presented, Southwire's petition, unsupported by any other member of the domestic industry, fails to meet the *Gilmore* interpretation of the "on behalf of" requirement, correctly stated by Commissioner Cass. As observed by this Court in *Gilmore*, the "interested party" (here, Southwire) must show that a majority of that industry backs its petition. Southwire clearly has been unable to show—or develop—any such backing.[4]

Nevertheless, Commissioner Cass apparently believed for several reasons that this failure did *not* prevent the ITC from issuing its final determination; indeed, he appears to have believed that the ITC could not do otherwise. (Presumably, the rest of the majority were of the same opinion for the same reasons.) First, Commissioner Cass noted Commerce's interpretation of "passivity", *i.e.*, refusal by an industry member to either support or oppose a petition, as constituting support for the petition. *Id.* Then, he posed the question whether the ITC has the authority itself to terminate a petition or investigation, even if it determines conclusively that the petitioner does not have standing to file or prosecute the petition. While acknowledging the "general proposition", restated in *Gilmore*, that "administrative agencies, like courts, enjoy inherent authority to recognize an absence of jurisdiction", and realizing that "the generally applicable rule governing authority to deny jurisdiction indicates that the Commission may be authorized to determine petitioner's standing", *Id.* at 21, Commissioner Cass nevertheless concluded that because of potential problems presented by dual determinations of standing (by both Commerce and the ITC), and because "Commerce has passed on this issue expressly", the ITC "presumably

---

**3.** This cogent observation should have sufficed to end the proceeding; why it did not is puzzling.

**4.** Southwire has from the outset acted alone in these proceedings. In *Gilmore*, the Court observed that the Trade Agreements Act of 1979, applicable in the present case, "is drafted throughout in terms of relief to an industry, not to individual manufacturers or producers." 7 CIT at 226, 585 F.Supp. at 676.

should not consider the [standing] issue." *Id.* at 22.

## APPLICABLE LAW AND CONTENTIONS OF THE PARTIES

The applicable statutory provisions on the "standing" issue involved in this case are 19 U.S.C. §§ 1671a(b)(1) and 1673a(b)(1) (1990). Section 1671a(b)(1), governing countervailing duty investigations is titled "Petition requirements", and states,

A countervailing duty proceeding shall be commenced whenever an interested party ... files a petition with the administering authority, *on behalf of an industry*, which alleges the elements necessary for the imposition of [countervailing duties]. (Emphasis added.)

Section 1673a(b)(1), governing antidumping investigations, has the same title and is materially identical in establishing the requirements for antidumping petitions. The phrase "industry" is defined in section 1677(4) generally as,

the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product.

These provisions establish at least two threshold requirements that must be met to properly file and prosecute a countervailing duty or antidumping petition: first, the petitioner must be an "interested party", as defined elsewhere in the statutes, and second, the petition must brought "on behalf of" a relevant domestic industry. The latter requirement is at issue in this case.

The requirement that a petition be filed on behalf of a domestic industry as defined in the statute was considered by this Court in *Gilmore Steel Corp. v. United States*, 7 CIT 219, 585 F.Supp. 670 (1984). In that case it was the government that sought to dismiss an antidumping petition because the petition allegedly was not brought on behalf of the relevant domestic industry, while the private plaintiff sought to *prevent* the dismissal. In upholding the dismissal of the plaintiff's petition, the Court stated,

[T]he plain meaning of "on behalf of" is "as the representative of," "as the proxy for," or "as the surrogate of."

7 CIT at 225, 585 F.Supp. at 675. The Court stated that the "interested party" portion of the section 1673a(b) standing requirement is,

the first step in a two-step process—not only must a petitioner be a member of the affected industry, *i.e.*, be an "interested party," it must also *show that a majority of that industry backs its petition.*

*Id.* at 226, 585 F.Supp. at 676 (emphasis added).

Plaintiffs rely on this characterization in arguing that an antidumping petitioner must demonstrate that it has the affirmative backing of a majority of the affected domestic industry.

The defendants, however, while not directly contesting the characterization in *Gilmore* of the "on behalf of" requirement, attempt to refute the conclusion drawn from that case by plaintiffs that a petition must be dismissed if the support of a majority of the domestic industry is not shown; instead, defendants argue that a petition need not be dismissed unless a majority of the relevant industry *opposes* the petition. Defendants rely, as support for their argument, on the decision of the Court of Appeals for the Federal Circuit in *Oregon Steel Mills v. United States*, 862 F.2d 1541 (1988), and several ensuing decisions of the Court of International Trade.

In *Oregon*, the CIT had reversed a decision by Commerce to revoke an antidumping order, which revocation had been based on Commerce's determination that there was insufficient industry support for the order's continuance. Six of the seven domestic producers of the relevant product had indicated opposition to continuance of the order (in favor of a subsequently-negotiated voluntary restraint agreement); only one favored the order. The Court of Appeals reversed the CIT's reinstatement of the order, holding that

[an] element in the affirmative determination is ... *industry support* for the antidumping duty order; and, thus, that

lack of industry support *alone* is a ground for revocation.

862 F.2d at 1543 (emphasis added). In deriving this holding from the statute, the Court of Appeals

agree[d] with [Commerce] that, because the purpose of an antidumping duty order is to aid an industry, not an individual company, industry *support* is an *essential element* of an affirmative determination.

*Id.* (emphasis added).

These statements of the Court of Appeals, standing alone, clearly support, and indeed require, overturning the orders of Commerce under review here. It is curious that defendants cite this case (*Oregon Steel*) for the proposition that industry support need not be shown. Defendants, however, point to several subsequent CIT decisions that are said to interpret *Oregon* to mean only that Commerce has the *discretion* to disallow or dismiss a petition not *opposed* by a majority of the domestic industry, but that the it is not *required* to do so simply because of a lack of *support* for the petition of a majority of the industry.

In *Citrosuco Paulista v. United States*, 12 CIT ——, 704 F.Supp. 1075 (1988), the Court rejected Citrosuco's argument that Commerce should have dismissed the antidumping petition because "an alleged majority of the [domestic] industry opposed the petition." 704 F.Supp. at 1084. The Court recited the holding of the CAFC in *Oregon* that Commerce has the *discretion* to dismiss a petition for lack of industry support, but stated that the CAFC "did not hold that Commerce is required to dismiss petitions that are not proven to be affirmatively supported by the domestic industry." *Id.* at 1085. The Court interpreted *Oregon* and *Gilmore* to mean that Commerce was *not* required to do so, accepting Commerce's assertion that

[n]either the statute nor Commerce's regulations require[s] a petitioner to establish affirmatively that it has the support of a majority of a particular industry....

*Id.*

As in *Citrosuco*, the Court in *Florex v. United States*, 13 CIT ——, 705 F.Supp. 582 (1989), on similar facts, construed *Gilmore* as holding only that Commerce *may* terminate a petition found not to be supported by the relevant industry; on the facts presented in that case, the Court accepted Commerce's view that the agency "*may* accept the petitioner's allegations as to its representation of industry views until industry lack of support is demonstrated...." 705 F.Supp. at 588.

In *Comeau Seafoods, Ltd. v. United States*, 13 CIT ——, 724 F.Supp. 1407 (1989), the plaintiff, challenging a countervailing duty petition as not filed on behalf of the domestic industry, argued that the *Gilmore* decision required Commerce to dismiss the petition as not affirmatively supported by a majority of that industry. The Court disagreed with that interpretation, construing *Citrosuco* as holding that Commerce has the *discretion*, not the *duty*, to dismiss petitions that are not shown to be actively supported by a majority of the domestic industry. 724 F.Supp. at 1411. The Court also referred to the legislative history of the "standing" requirement, stating that Congress intended for investigations to be initiated in response to petitions unless the agency is "convinced that the petition fail[ed] to state a claim upon which relief [could] be granted under § 701 ... or the petitioner [did] not provide information supporting the allegations which [was] reasonably available to him." *Id.* (bracketed alterations in original).

Plaintiffs contend that the facts presented in the instant case are materially different from those in *Citrosuco, Florex*, and *Comeau*, and that those decisions consequently are not dispositive of the standing issue presented here.

## ANALYSIS

■ As presented by the parties, the standing issue in this action seems akin to the question whether the familiar glass of water is half-empty or half-full: plaintiffs argue that a petition must be shown to be *supported* by a majority of the relevant domestic industry; defendants contend that it only need be shown that a majority of the industry does *not oppose* the petition.

These two conceptions of the standing requirement are not, however, simply two ways of stating the same proposition; rather, the choice of one over the other has practical and important consequences. Moreover, unlike the meditations attending the former, more metaphysical question, a definite resolution is necessary concerning the standing requirement explicitly prescribed by Congress.

The express language of the applicable statutes requires that a petition, to be properly entertained, be found to have been filed "on behalf of" "the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product." 19 U.S.C. §§ 1671a(b)(1), 1673a(b)(1), 1677(4).[5] According to the plain meaning of these words, the petition must be brought on behalf of either *all* of the domestic industry by number of *producers* ("the domestic producers *as a whole*") or a *majority* of the domestic industry by *percentage of production* ("producers whose collective output ... constitutes a *major proportion* of the total domestic *production* ...").

■ When the meaning of statutory language is clear, the Court must give effect to the statute in accordance with that meaning; it is not necessary to find corroboration of that meaning in the legislative history or other extra-statutory sources. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975); *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("Absent a clearly expressed legislative intention to the contrary, [the statutory] language must ordinarily be regarded as conclusive.") As the Supreme Court has noted, "[g]oing behind the plain language of a statute in search of a possibly contrary congressional intent is 'a step to be taken cautiously' even under the best of circumstances." *American Tobacco Co. v. Pat-*

*terson*, 456 U.S. 63, 75, 102 S.Ct. 1534, 1540, 71 L.Ed.2d 748 (1982) (quoting *Piper v. Chris Craft Industries*, 430 U.S. 1, 26, 97 S.Ct. 926, 941–42, 51 L.Ed.2d 124 (1977). No such circumstances are present here.

In *Gilmore*, the Court effectuated the language of the above statutes in holding that a petitioner "must ... show that a majority of [the domestic] industry *backs its petition.*" 7 CIT at 226, 585 F.Supp. at 676 (emphasis added). That holding, like the statutes it applied, is not ambiguous. Nor is the holding of the Court of Appeals for the Federal Circuit in *Oregon* that

> [an] element in the affirmative determination is ... industry support for the antidumping duty order; and, thus, that lack of industry support alone is a ground for revocation[;]
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> [that] industry *support* is an essential element of an affirmative determination. 862 F.2d at 1543 (emphasis added).

Those decisions clearly do not hold that it need only be shown that a majority of the industry does *not oppose* a petition, the position taken by defendants in this action; rather, the decisions clearly require a showing, pursuant to the express words of the statutes, that a majority of the industry *backs* or *supports* the petition. To the extent that the CIT decisions discussed above construe otherwise the applicable statutes and the *Gilmore* and *Oregon* decisions, such constructions are either *dicta* or are limited to the specific facts presented in those cases; in either event, they are not applicable on the facts of this case.

The Court in *Citrosuco* stated that while the *Oregon* decision recognizes Commerce's *discretion* to dismiss petitions for lack of industry support, the Court of Appeals in that decision "did not hold that Commerce is *required* to dismiss petitions that are not proven to be affirmatively supported by the domestic industry." 704 F.Supp. at 1085. Neither, however, did the Court of Appeals in *Oregon* hold that Com-

---

**5.** Nowhere in the statute, nor in the legislative history, is there support for the proposition that

a negative finding of majority *opposition* is required.

merce is *not* required to dismiss such a petition. While the *Oregon* opinion states that the agency possesses the affirmative discretion to dismiss an unsupported petition, a true reading of the holding does not indicate that the agency has the negative discretion, as a general rule, to *refuse* to dismiss such an unsupported petition. That would simply constitute discretion to ignore the statutory requirement, surely an improper result. The plaintiff in *Oregon* had challenged Commerce's *authority* to dismiss such a petition, and the Court of Appeals upheld that authority of Commerce. That holding can not be construed to mean that Commerce may promulgate an affirmative determination based on a petition, like the one in the present case, not shown to be supported by a majority of the domestic industry; in fact, the decision clearly states the contrary in recognizing that an *"essential element"* of an affirmative determination is *"support"* for (not a lack of opposition to) the underlying petition on the part of the domestic industry.

In *Florex*, the petitioner before the agency was a trade association of flower growers ninety-two of whose members had signed the antidumping petition at issue. The plaintiffs opposed the petition by arguing that the petitioners did not act "on behalf of" the domestic industry, since only ninety-two of the association's members *signed the petition itself,* allegedly a "small part" of the cut flower industry. The Court stated:

> The fact that only 92 [association] members signed the petition does not indicate that other members of the industry do not support the petition.
>
> *   *   *   *   *   *
>
> [A] majority of the [association's] membership would seem to constitute *a large fraction of the domestic flower industry,* if one views the industry on a grower by grower basis. In addition, [Commerce] *did not receive one U.S. industry petition indicating opposition to the petition.*

705 F.Supp. at 587–88 (emphasis added). On those facts, the Court upheld Commerce's position that Commerce

need not look beyond the petition as to this element of standing unless information is produced indicating that domestic industry does not support the petition. *Id.* at 587.

The factual context in *Florex* is thus narrow in that the plaintiff's only basis for alleging lack of industry support was the number of companies that *signed the petition,* not the fact that any specific companies opposed the petition nor even that any refused affirmatively to support it. Because of this limited basis of the plaintiff's challenge, then, the Court's interpretation of *Gilmore* in the context of that challenge should not be construed broadly as extending to cases such as the present one in which opponents of the petition argue not simply that a majority of the domestic industry did not sign the petition, but that the *entire industry* has made its views known, that not a single member other than the petitioner supports the petition, and that one of the major industry members actively opposes it.

Also distinguishing *Florex* from the present case is the fact that in *Florex* there were no indications whatsoever from the industry regarding its position beyond the ninety-two companies that signed the petition (the total number of industry members in that case was much larger than in the present case); the Court emphasized that Commerce "did not receive one U.S. industry submission indicating opposition to the petition." 705 F.Supp. at 588. This absence of any expression of countervailing sentiment from the industry in *Florex,* in addition to the more limited nature of the plaintiffs' challenge there, also distinguishes that case from the present one in which one of the major domestic producers of the product at issue actively opposed the petition and all of the other producers (excepting petitioner Southwire) expressly declined to take a position supporting it. The *Florex* holding thus provides little support for the construction of *Gilmore* and the statutes involved here as permitting the defendant Government agencies in the instant case to accept the petition that was not affirmatively supported by a majority

of the domestic industry but only by the one company that filed it.

There also exists a material distinction between the factual contexts in the present case and in *Comeau*. While certain members of the domestic industry opposed the petition in *Comeau*, the Court accepted Commerce's argument that "the opposition's position logically derived from their status as importers [and that] issuance of a countervailing duty order covering [the product] would result in these entities being liable for payment of countervailing duties." 724 F.Supp. at 1411. In addition, one group of opponents opposed the petition with respect to another product involved in the petition, which product was not involved in the challenge before the Court. The present defendants allege that the plaintiff, and opponent of the petition herein, ALCOA "had developed strong business ties with" plaintiff Sural.[6] Opposition at 17 & n. 30. Unlike the situation of the opponents in *Comeau*, however, there appears no allegation that ALCOA was an importer of the product in question, nor that it would be liable for any duties levied as a result of the petition. In any event, the statute provides in section 1677(4)(B) for the exclusion "in appropriate circumstances" from the surveyed "domestic industry" of any domestic producers "related to" the party or parties subject to the investigation. The defendants do not argue, and apparently have not argued, that ALCOA should be excluded from the equation under this provision, and it would therefore be unwarranted for the Court itself to discount or disregard ALCOA's opposition to the petition on the basis of its alleged relations with Sural.

In *Comeau*, the Court referred to the legislative history of the statute containing

the standing requirement which states that Congress intended for petitions to be accepted unless the agency is convinced that the petition "fails to state a claim upon which relief can be granted" or the petitioner "does not provide information supporting the allegations which is reasonably available to him." 724 F.Supp. at 1411. That statement, however, simply recognizes the requirement that a petitioner must allege the substantive elements necessary for relief under the antidumping or countervailing duty statutes.[7] It should not be read as obviating the independent requirement of standing stated separately in the statute. In the preceding paragraph of the legislative history cited in *Comeau*, under the heading "Reason for the Provision", it is stated that under the statutory provisions involved in the instant case,

(1) a petition must be accepted for filing, (2) the [administering] authority must determine whether to initiate an investigation within 20 calendar days after filing, *and (3) a person wishing to file a petition must meet standing requirements.*[8]

The Senate Report goes on to state,

The standing requirements ... implement Article 2(1) of the [Agreement on Interpretation and Application of Articles VI, XVI, and XXIII of the General Agreement on Tariffs and Trade—the GATT "Subsidies Code"]. The committee intends that they be administered to provide an opportunity for relief to an adversely affected *industry* and to prohibit petitions filed by persons with no stake in the result of the investigation.[9]

The Senate Report providing the legislative history for the antidumping provisions of the legislation contains statements identical

---

**6.** It is also clear that petitioner Southwire had had strong business ties with Sural, that those ties had been severed, and that in furtherance of the apparent causes involved in that severance Southwire attempts to use Commerce and the ITC for its adversarial private litigation.

**7.** *See* S.Rep. No. 249, 96th Cong., 1st Sess. 2, *reprinted* in 1979 U.S.Code Cong. & Admin. News at 381, 432, n. 1. (listing "elements necessary" for relief that must be alleged in countervailing duties case as,

Material injury or threat of material injury to a domestic industry, or material retardation of establishment of a domestic industry, by reason of imports of a class or kind of merchandise with respect to the manufacture, production, or exportation of which a subsidy is being provided.

**8.** *Id.* at 432–33.

**9.** *Id.* (emphasis added).

in material respects to those quoted above concerning the countervailing duties provisions. The standing requirements for anti-dumping petitions, are stated to have been adopted to implement the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade (the GATT Revised "Anti–Dumping Code").[10]

These statements in the Senate Report show that the standing requirements are separate from the allegations required to "state a claim", discussed in the Report excerpt referred to in *Comeau*. They also show that the dual standing requirement is mandatory, a necessary condition for a grant of affirmative relief.[11] This is especially so because the statutes involved were adopted in implementation of international agreements concluded by the United States pursuant to the General Agreement on Tariffs and Trade.[12] It is necessary *both* that a petition be brought by an "interested party" (to prevent actions by persons with, in the language of the Senate report, "no stake in the result of the investigation"), *and* that it be supported by a majority of the domestic industry (to ensure that relief is provided to "an adversely affected *industry* ").

Moreover, in arriving at its decision in *Comeau*, the Court relied on the holding in *Citrosuco* that in that latter ·case Commerce had the discretion, but not the duty, to dismiss the petition involved in that case. The distinctions between *Citrosuco* and the present case have been described above, and the reliance on that case by the Court in *Comeau* underscores further the limited applicability of the *Comeau* decision to the present dispute. Because of the distinctions between the two cases, the holding in *Comeau* does not operate on the present facts to alter the requirement of industry support expressly prescribed by the statutes, *Oregon*, and *Gilmore*.

Whatever may be the required showing, and whoever may have the burden of proof, concerning the standing requirement when the sentiments of certain members of the domestic industry are not known or are not cognizable, or when opponents of a determination base their challenge on the number of signatures on the petition itself, such questions are not presented or decided here. On the facts of the present case, it is clear, according to the statutory provisions analyzed herein and the decisions in *Gilmore* and *Oregon*, that, in the words of the Court of Appeals in *Oregon*,

"industry support is an essential element of an affirmative determination" and that, in the words of this Court in *Gilmore*, the petitioner "must ... show that a majority of that industry backs its petition." Southwire did not make such a showing, since 66% of the industry by production and 83.4% of the producers expressly declined to support the petition, with part of these percentages actively opposing it. Acting Chairman Brunsdale stated in her dissent:

I also note the complete lack of support within the industry for this petition.

\*　　\*　　\*　　\*　　\*　　\*

No other EC rod producer [than Southwire] supported the petition, even though support requires only a check mark on the Commission's questionnaire. An industry that perceives itself to be injured logically would rally behind a petition since such support is essentially cost-free.

ITC Final Determination at 40–41.

Notwithstanding these facts, defendants advance several additional arguments in support of recognizing Southwire's standing to prosecute its petition nevertheless. First, defendants cite alleged disincentives for an industry member to express its support for a petition. Second, defendants argue that because of the bifurcated nature of administrative authority in anti-dumping and countervailing duty cases, divided between Commerce and the ITC, the

---

**10.** *See* 1979 U.S.Code Cong. & Admin.News at 449, 420; *see also id.* at 446–49.

**11.** Adopted and reiterated by the CIT in *Gilmore*.

**12.** *See Matsushita Elec. Indus. Co. v. United States*, 6 CIT 25, 31, 569 F.Supp. 853, 859 (1983) *rev'd on other grounds*, 823 F.2d 505 (Fed.Cir. 1987). (Courts should construe U.S. trade laws in harmony with international agreements the laws were intended to implement.)

ITC was bound in this case to defer to the earlier decision by Commerce not to consider the challenge to Southwire's standing.

Defendants seek to explain the failure of the other industry members to support the petition by arguing that support of the petition would have required the companies to disclose certain business information for use in the investigation. Therefore, argues the defendant Government, "the Commission process would not necessarily provide accurate information on support for the petition." Opposition at 17–19. Thus, the Government adopts the curious position of arguing essentially that its own procedures for discerning the level of industry support are inaccurate and that because of that fact the very statutory requirement of industry support that those procedures are designed to effectuate should be ignored. Aside from this obvious anomaly, it also would be highly inappropriate to ignore the statutory requirement simply to spare the domestic companies some perceived discomfort or inconvenience. Moreover, the administering agencies apparently request substantial amounts of business information from companies that *oppose* a petition, as well; this is evident, for just one example, in the information apparently solicited from ALCOA, as a result of its opposition of the petition, concerning its business relations with the Venezuelan plaintiff Sural. To the extent that the requirement of submission of information by respondent industry members might deter those members from supporting a petition, then, it is equally likely that the requirement would deter expressions of *opposition* to a petition. These arguments are irrelevant, however, in the face of the clear statutory language.

Commissioner Brunsdale suggested another explanation for the failure of the other industry members to indicate their support for the petition by checking the appropriate box on the form:

This response, however, supports my principal point that the domestic industry is engaged in a dynamic retrenchment that predates and has little to do with the Venezuelan imports at issue. Indeed, if the industry perceived injury from the Venezuelan imports and was inclined to continue EC rod production on an increased scale, it would presumably indicate its support for Southwire's position.

Final Determination at 41.

Congress did not include in the statute an exception to the requirement of industry support for situations in which an agency might speculate that potential supporters might not wish to provide certain business information, and it is not for the Court to judicially create such an exception.[13] If the procedures adopted by the administering agencies deter the expression of industry views, that is a problem to be resolved by, indeed, uniquely resolvable by, the agencies themselves. Surely it is a perversion to ignore the requirement of industry support expressly promulgated by Congress in the above statutes, because of actual or perceived *inconveniences* caused by agency procedures adopted in furtherance of those very statutes.

Defendants additionally argue that because of the bifurcation of administrative authority in these areas between Commerce and the ITC, once Commerce has made a determination on the issue of standing or, as in the present case, has declined to make a complete determination on the issue, the ITC should or must defer to Commerce's resolution of the issue. Defendants also point out that Commerce did not have access during its initial deliberations to the data concerning industry views later obtained by the ITC. In his "Additional Views" appended to the majority opinion in the ITC Final Determination, Commissioner Cass acknowledged the complete lack of industry support for Southwire's petition, but stated that because of the bifurcated procedures established by

**13.** *See, e.g., Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 866, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984), stating that federal judges—who have no constituency— have a duty to respect the legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of … policy choices and resolving the struggle between competing views of the public interest are not judicial ones.

Congress for these cases, once Commerce has declined to dismiss a petition for lack of industry support it would not be wise for the ITC to later decide that issue differently. Final Determination at 20–22.

Through that argument, then, the issue of standing is given the proverbial "runaround": Commerce claims that it is not required to independently investigate the matter beyond the communications of opposition sent to it by the persons on their own initiatives; the ITC, in turn, notwithstanding the results of the inquiry it *did* conduct, claims that it need not, indeed may not, independently determine the existence or absence of a petitioner's standing when Commerce has already accepted the petitioner's representations on the issue. Significantly, this logically would be the ITC's position even if its own inquiry revealed that every member of the domestic industry other than the single petitioner actively opposed a petition; and while according to the ITC Commerce has the *authority* to investigate and determine the issue of standing, Commerce may not, as noted above, be aware of the results of the ITC investigation of that very issue. The question arises, moreover, why the ITC conducts its inquiry into the level of industry support when it apparently would defer to any decision on, or refusal to decide, that issue by Commerce, even if the ITC inquiry revealed overwhelming opposition to a petition; the ITC's own inquiry seems meaningless in this light.

This "run around" is the type of circular argument to be expected in a journey "Through the Looking Glass", not in the administration by agencies of statutes placed within their jurisdiction by Congress, and certainly not in their determinations of whether a party even has standing to invoke that jurisdiction. The problem is compounded by both agencies' interpretation of the statutes prescribing standing requirements in a manner manifestly contrary to the plain language of the statutes and their prior construction by decisions of this Court and the Court of Appeals for the Federal Circuit in *Gilmore* and *Oregon*.

In any event, the Court finds highly questionable Commissioner Cass's conclusion that "Commerce ha[d] passed on this issue [of standing] expressly." *Id.* at 22. Commerce states that it "relies upon petitioners' representation that it has filed 'on behalf of' the domestic industry" until it is affirmatively demonstrated otherwise (presumably by third parties on their own initiative). 53 Fed.Reg. at 24,764. In this case, when ACPC and the Aluminum, Brick and Glass Workers Union contacted Commerce to oppose Southwire's petition *and* to challenge its standing, Commerce solicited information from those two entities concerning their share of the market, and after concluding that they did not constitute a majority, simply concluded that the rest of the industry supported the petition; in effect, then, Commerce interpreted the failure of other industry members to contact Commerce on their own initiatives to oppose the petition as constituting support for the petition. It therefore can not be said that Commerce *expressly* passed upon ALCOA's standing challenge by simply accepting the petitioner's (contested) allegations of support by a majority of the industry.

At least that is not the kind of determination required. The statutes require that a petition must be filed "on behalf of" a majority of the industry, *not* that it be "not opposed by" the domestic industry. Commerce's "methodology" utilized here effectively shifts to opponents of a petition the burden of proof concerning the standing of a petitioner, even when those opponents have—or an opponent has—already contacted Commerce to oppose the petition and challenge the petitioner's standing. To simply assume petitioners' standing in such circumstances surely would represent one of the more lax standing requirements in modern jurisprudence. Such an assumption is especially troubling where, as in the present case, the views of the entire domestic industry were known, through the ITC survey, and not one industry member supported the petition other than the petitioner itself. The combined effect of these circumstances is that neither agency fully investigates *and* determines the issue of in-

dustry support, even though it is known that the petitioner was unable to enlist the support of a single other industry member for its petition. This result flies in the face of the statutes and the *Gilmore* and *Oregon* decisions. For the administering agencies to simply accept a petitioner's assertions of its standing when an absence of such standing is known constitutes "an overly sweeping view of the[ir] authority" under the statutes they are charged with administering. *Olympic Adhesives, Inc. v. United States,* 899 F.2d 1565, 1571 (1990).

Commissioner Cass stated that the antidumping and countervailing duties laws should be construed in a manner that avoids the potential for inter-agency conflicts in the bifurcated administrative scheme established by the "overall structure of Article VII" of the 1930 Tariff Act, such as conflicting decisions by Commerce and the ITC on the issue of standing. ITC Final Determination at 21. These laws also should be interpreted to give effect to the requirements they prescribe, and more specific provisions should especially be effectuated over more general provisions or policies. *Preiser v. Rodriguez,* 411 U.S. 475, 489–90, 93 S.Ct. 1827, 1836–37, 36 L.Ed.2d 439 (1973); *Brown v. Gen'l Serv's Admin.,* 425 U.S. 820, 834, 96 S.Ct. 1961, 1968–69, 48 L.Ed.2d 402 (1975); 2A C. Sands, Sutherland, Statutory Construction § 51.05 (4th ed.1973) (stating general rule that "[w]here one statute deals with a subject in general terms, and another deals with part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is any conflict, the latter will prevail. . . .") (cited in *Simpson v. United States,* 435 U.S. 6, 15, 98 S.Ct. 909, 914, 55 L.Ed.2d 70 (1977). Here, there are specific requirements that a petition be filed by an "interested party" and that it be filed "on behalf of" the relevant domestic industry; those requirements would be negated in these circumstances by the more nebulous "overall structure of Title VII" establishing bifurcated administrative responsibilities. Given the existence of specific standing requirements, the Court must enforce those requirements, especially relative to the extremely vague "overall structure"

argument offered in opposition to their enforcement.

As to which agency (if only one) should investigate and determine the "industry support" portion of the standing requirement in the first instance, and precisely how that process should be undertaken, such broader questions are not before the Court in this case. Instead, the Court is presented with a situation in which plaintiffs have demonstrated, after the conclusion of proceedings at both Commerce and the ITC, that not a single member of the domestic industry other than the petitioner was willing to support the petition, and that a significant portion of the industry affirmatively opposes it. As plaintiffs correctly point out, the standing requirement, in both of its elements, "is not a technicality and should be enforced." Memorandum at 37–8. In the situation here presented, the requirement is enforced by vacating the countervailing and antidumping duties orders; it is not necessary to pronounce on other situations not before the Court.

## ORDER

Upon reading plaintiffs' motion for judgment upon the agency record, defendants' and defendant-intervenor's opposition thereto, and all other pleadings and papers filed with regard thereto, it is hereby

ORDERED that plaintiffs' motion is granted; it is further

ORDERED that the affirmative antidumping and countervailing duties determinations of the Department of Commerce and the International Trade Commission under review in this action are reversed; and it is further

ORDERED that the outstanding antidumping and countervailing duties orders promulgated from those determinations are vacated.