**SURAMERICA de ALEACIONES LAMINADAS, C.A., Conductores de Alumino del Caroni, C.A., Industria de Conductores Electricos, C.A., and Corporacion Venezolana de Guayana, Plaintiffs–Appellees,**

v.

**The UNITED STATES, United States International Trade Commission and Southwire Company, Defendants–Appellants.**

Nos. 91–1015, 91–1050 and 91–1055.

United States Court of Appeals,
Federal Circuit.

June 11, 1992.

Rehearing Denied July 8, 1992.

Suggestion for Rehearing In Banc
Declined July 23, 1992.

Claire E. Reade, Arnold & Porter, of Washington, D.C., argued for plaintiffs-appellees. With her on the brief were Michael A. Faber, Nancy L. Perkins and Jack H. Cleland.

Lawrence J. Bogard, McKenna & Cuneo, of Washington, D.C., argued, for defendants-appellants. With him on the brief were Victor M. Wigman and Ralph C. Patrick, Wigman & Cohen, P.C., of Arlington, Va., of counsel. Abigail A. Shaine, Atty., Internl. Trade Com'n, of Washington, D.C., argued, for defendants-appellants. With her on the brief were Lyn M. Schlitt, Gen. Counsel and James A. Toupin, Asst. Gen. Counsel. Of counsel was Carol McCue Verratti, Internl. Trade Com'n. David M. Cohen, Director, Commercial Litigation Branch, Dept. of Justice, of Washington, D.C., argued for defendants-appellants. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., and Vanessa P. Sciarra, Atty. Also on the brief were Stephen J. Powell, Chief Counsel for Import Admin., Berniece A. Browne, Sr. Counsel for Antidumping Litigation and Robert J. Heilferty, Attorney–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel.

Before ARCHER, Circuit Judge, MILLER, Senior Circuit Judge, and PLAGER, Circuit Judge.

PLAGER, Circuit Judge.

Appellants are the United States, acting through the Department of Commerce (Commerce), the United States International Trade Commission (ITC), and Southwire Company (Southwire). They appeal from a decision of the Court of International Trade, 746 F.Supp. 139 (CIT 1990). After an investigation spurred by a petition filed by Southwire, the ITC and Commerce promulgated antidumping and countervailing duty determinations and issued corresponding orders regarding certain Venezuelan imports. The Court of International Trade's decision reversed the determinations and vacated the orders. We reverse.

## I. BACKGROUND

Southwire is the leading domestic producer of electrical conductor aluminum redraw rod (EC rod)—wrought rod of aluminum, electrically conductive and containing at least ninety-nine percent by weight aluminum. Appellees Suramerica de Aleaciones Laminadas, C.A. (Suramerica), Conductores de Aluminio del Caroni, C.A., and Industria de Conductores Electricos, C.A. are Venezuelan companies (collectively, Venezuelan producers) that produce EC rod. Appellee Corporacion Venezolana de Guayana (CVG) is a Venezuelan Government development authority that acts as a holding company for Venezuela's two primary EC rod producers.

On July 14, 1987, Southwire filed petitions with Commerce, urging antidumping and countervailing duty investigations of certain imports of EC rod from Venezuela. As statutorily required, the petitions indicated that Southwire was filing them "on behalf of" the domestic industry. Southwire emphasized that, in addition to representing its over one-third of the domestic EC rod production, Southwire had also contacted three of the other five domestic producers, whose total production, when added to Southwire's, constituted the bulk of production of the domestic industry. These other producers [1] were said to have assured Southwire that "while they have not formally joined in the petition, . . . they do not oppose it."

Southwire's antidumping petition indicated that the subject imported EC rods were being, or were likely to be, sold in the United States at substantially less than fair

---

1. The other domestic producers were later identified by Southwire as Alcan Aluminum Corp., Noranda Aluminum, Inc., and Reynolds Metal Company.

market value. This dumping of EC rods was said to materially injure, or threaten to materially injure, the domestic EC rod industry.

Southwire's countervailing duty petition indicated that the Venezuelan government was directly and indirectly providing subsidies for the manufacture of the EC rods to be exported to the United States. Those subsidies were described as causing or threatening to cause material injury to the domestic industry.

On August 3, 1987, Commerce began its antidumping and countervailing duty investigations into Southwire's contentions. Commerce notified the ITC of its investigations, and on August 28, 1987, the ITC determined that there was a reasonable indication that Venezuelan imports of EC rod were causing material injury to the domestic industry.

On August 31, 1987, Reynolds Metal Company (Reynolds) sent a letter to Commerce. Reynolds stated that, while it did not wish to take a position on the EC rod investigations, it "fundamentally oppose[d] any unfairly traded imports."

On September 24, 1987, Alcoa Conductor Products Company (Alcoa Conductor), a division of Aluminum Company of America (Alcoa), sent a letter to Commerce stating that it did not support Southwire's petition. Upon Commerce's request for further information, Alcoa Conductor replied in October that:

1) it was speaking on behalf of Alcoa as well as for itself;

2) Alcoa's share of the domestic EC rod market was estimated at 22% for 1986, and at 24% for the first three quarters of 1987;

3) Alcoa's 1986 domestic production and importation from Venezuela[2] of EC rod were 51,417 tons and 17,348 tons, respectively; for three quarters of 1987, the figures were 35,000 tons and 7,809 tons;

4) on September 30, 1987, Alcoa sold its domestic electrical conductor manufac-

turing business to Alcoa Conductor, an affiliate of Suramerica; and

5) while Alcoa has contracted to sell EC rod to Alcoa Conductor, Alcoa Conductor intends also to purchase EC rod from Venezuelan or other competitive sources.

Alcoa Conductor also noted that its earlier statement that Alcoa does not support Southwire's petitions "means that Alcoa opposes the Petitions on which the investigations are based."

The Aluminum Trades Council (the Council), a trade union association, sent a letter to Commerce on November 12, 1987, opposing Southwire's petitions. The Council expressed concern that if the result of investigations pursuant to Southwire's petitions led to a lack of available EC rod, jobs could be jeopardized. Commerce, however, responded that the Council did not "represent an industry producing or wholesaling [EC rod]." Thus, the Council was not an "interested party," and was unable to file an opposition which could be considered by Commerce.

On June 22, 1988, Commerce issued its final determinations in both the antidumping and countervailing duty investigations. Commerce concluded that certain Venezuelan EC rod was being or likely to be sold in the United States at less than fair value, and that Venezuelan manufacturers, producers or exporters were receiving subsidies estimated to be 64.62% *ad valorem*. Commerce also noted that it had notified the ITC of its determinations, and that the ITC would determine whether the imports materially injured or threatened to materially injure the domestic EC rod industry.

In both determinations Commerce stated that, based on the respective statutory provisions governing standing of parties to bring petitions to commence investigations, it

relies upon the petitioner's representation that it has filed "on behalf of" the domestic industry until it is affirmatively shown that a majority of the domestic industry opposes the petition.... [N]ei-

---

**2.** According to Alcoa, the Venezuelan EC rod, all used internally, was the only EC rod imported

by Alcoa during these time periods.

ther the [statutory framework] nor its legislative history restricts access to the unfair trade laws by requiring that parties petitioning for relief ... establish affirmatively that a majority of the members of the relevant domestic industry support the petition. The only requirement is that the party filing the petition act as the representative of the domestic industry.

Commerce also made it clear that "[when] domestic industry members opposing a petition provide a clear indication that there are grounds to doubt a petitioner's standing, [Commerce] will evaluate the opposition to determine whether the opposing parties ... represent a majority of the domestic industry." Commerce conducts its evaluation of the opposition generally by requesting the opponents of a petition to supply information regarding their stakes in the domestic industry. There usually is no canvas of the entire domestic industry. In this manner, Commerce determines whether the affirmative opposition in fact reaches a majority of the domestic industry.

Based on the record before it, Commerce concluded that there was no showing in this case that a majority of the domestic industry opposed Southwire's petitions. Commerce went on to support its conclusions that the subject Venezuelan EC rod was being subsidized, and was sold or likely to be sold at less than fair market value.

Appellees, the Venezuelan producers and CVG, commenced their action in the Court of International Trade to contest Commerce's determinations, as well as ITC's subsequent determinations and the resulting antidumping and countervailing duty orders. Appellants Commerce, the ITC, and Southwire opposed the request to reverse the determinations and vacate the orders.

The Court of International Trade held that "the petition was not filed on behalf of the relevant domestic industry as required by the statutes, 19 U.S.C. §§ 1671a(b)(1) and 1673a(b)(1)." *Suramericana de Aleaciones Laminadas, C.A. v. United States*, 746 F.Supp. 139, 141 (CIT 1990). The ensu-

ing investigation was therefore declared a nullity, and the agency determinations were vacated. *Suramericana*, 746 F.Supp at 140. The remaining issues raised in the suit, challenging Commerce's and the ITC's determinations on the merits, were not addressed.

The Court of International Trade based its conclusions "[o]n the threshold issue of the standing of petitioner Southwire to initiate and pursue the petition in this case." *Suramericana*, 746 F.Supp. at 143. *Gilmore Steel v. United States*, 585 F.Supp. 670 (Ct. Int'l Trade 1984) was cited for the requirement that "the interested party" (here, Southwire) must show that a majority of [the domestic] industry backs its petition." *Suramericana*, 746 F.Supp. at 144. This court's opinion in *Oregon Steel Mills v. United States*, 862 F.2d 1541, 7 Fed. Cir.(T) 22 (Fed.Cir.1988) was said to be consistent with this conclusion. *Suramericana*, 746 F.Supp. at 146 & 150. Appellants had argued that *Oregon Steel* stood for the proposition not that industry support need be affirmatively shown, but rather that Commerce has the discretion, but is not required, to disallow or dismiss a petition not demonstrated to be supported by a majority of the domestic industry. *Suramericana*, 746 F.Supp. at 146.

The Court of International Trade relied on "[t]he express language of the applicable statutes," *Suramericana* at 147, and the legislative history, including references to implementation of the General Agreement on Tariffs and Trade (GATT). *Suramericana* at 149. The Court of International Trade concluded that "[t]he statutes require that a petition be filed 'on behalf of' a majority of the industry, *not* that it be 'not opposed by' the domestic industry." *Suramericana* at 152. That requirement was enforced by vacating the countervailing and antidumping duties orders.

## II. DISCUSSION

### A. *The Relevant Statutory Provisions*

The question before us is one of statutory interpretation, a matter which we decide without deference to the trial court.

The relevant statutory provisions are found in Title 19 of the United States Code:

### § 1671a. Procedures for initiating a countervailing duty investigation

. . . .

#### (b) Initiation by petition

##### (1) Petition requirements

A countervailing duty proceeding shall be commenced whenever an interested party ... files a petition with the administering authority, on behalf of an industry, which alleges the elements necessary for the imposition of [a countervailing duty under § 1671(a) [3]], and which is accompanied by information reasonably available to the petitioner supporting those allegations....

. . . .

#### (c) Petition determination

Within 20 days after the date on which a petition is filed ..., the administering authority shall—

(1) determine whether the petition alleges the elements necessary for the imposition of [the countervailing duty requested] ...,

(2) if the determination is affirmative, commence an investigation to determine whether a subsidy is being provided [as alleged in the petition], and provide for the publication of notice of the determination to commence an investigation in the Federal Register, and

(3) if the determination is negative, dismiss the petition, terminate the proceeding, notify the petitioner in writing of the reasons for the determination, and provide for the publication of notice of the determination in the Federal Register.

and

### § 1673a. Procedures for initiating an antidumping duty investigation

. . . .

#### (b) Initiation by petition

##### (1) Petition requirements

An antidumping proceeding shall be commenced whenever an interested party ... files a petition with the administering authority, on behalf of an industry, which alleges the elements necessary for the imposition of [an antidumping duty under § 1673 [4]], and which is accompanied by information reasonably available to the petitioner supporting those allegations....

. . . .

#### (c) Petition determination

Within 20 days after the date on which a petition is filed ..., the administering authority shall—

(1) determine whether the petition alleges the elements necessary for the imposition of [the antidumping duty requested] ...,

(2) if the determination is affirmative, commence an investigation to determine whether the class or kind of merchandise described in the petition is being, or is likely to be, sold in the United States at less than its fair value, and provide for the publication of notice of the determination in the Federal Register, and

(3) if the determination is negative, dismiss the petition, terminate the proceeding, notify the petitioner in writing of the reasons for the determination, and provide for the publication of notice of the determination in the Federal Register.

**3.** 19 U.S.C. § 1671(a) (1988) provides that, upon a determination that a domestic industry is being materially injured or threatened with material injury by merchandise, being imported or sold for importation into the United States, which is subject to a foreign subsidy, there shall be imposed a countervailing duty equal to the amount of the net subsidy.

**4.** 19 U.S.C. § 1673 provides in part that, upon a determination that a domestic industry is suffering or threatened with material injury by merchandise which is being imported, or sold or likely to be sold for importation, into the United States, and which is being or likely to be sold in the United States at less than its fair value, there shall be imposed an antidumping duty equal to the amount by which the foreign market value exceeds the United States price for the merchandise.

Definitions of key terms are provided in 19 U.S.C. § 1677 (1988):

#### (4) Industry

##### (A) In general

The term "industry" means the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product....

##### (B) Related parties

When some producers are related to the exporters or importers, or are themselves importers of the allegedly subsidized or dumped merchandise, the term "industry" may be applied in appropriate circumstances by excluding such producers from those included in that industry.

....

#### (9) Interested party

The term "interested party" [includes]—

....

(C) a manufacturer, producer, or wholesaler in the United States of a like product,

....

but this subparagraph shall cease to have effect if the United States Trade Representative notifies the administering authority and the Commission that the application of this subparagraph is inconsistent with the International obligations of the United States.

### B. *Interpretation of the Relevant Statutory Provisions*

Sections 1671a(b) and 1673a(b) require that, in order to properly petition for countervailing and antidumping duty investigations, Southwire must be an interested party filing on behalf of the domestic industry.

Southwire clearly is an "interested party" in these proceedings. *See* 19 U.S.C. § 1677(9)(C). The question here is whether Southwire's petitions should be considered to be filed "on behalf of" the domestic industry, as contemplated by the statute.

1.

■ The phrase "on behalf of" is not among the terms defined in 19 U.S.C. § 1677. Nor does the statutory context provide us any concrete indication of Congress's intended meaning. When such an interpretational gap exists regarding a statutory provision, we are to examine whether, in its own interpretation of its responsibilities under the Act, the agency charged with the everyday administration of the provision applies "a permissible construction." [5] *Chevron U.S.A. Inc. v. National Resources Defense Council Inc.*, 467 U.S. 837, 866, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984). Our duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute. *See Chevron*, 467 U.S. at 866, 104 S.Ct. at 2793.

Thus, in our review here we will simply determine whether Commerce's [6] interpretation of the phrase "on behalf of," as it pertains to the statutory requirements for filing a petition to initiate a countervailing or antidumping duty investigation, is a permissible construction. Whether we would come to the same conclusion, were we to analyze the statute anew, is not the issue.

2.

The Court of International Trade held that its decision was consistent with this court's holding in *Oregon Steel*. We agree, but with a caveat—the issue in this

---

5. This assumes that the agency is by virtue of its responsibilities under the Act and its expertise, entitled to the benefit of *Chevron* deference. We believe both Commerce and the ITC qualify.

6. Although both Commerce and the ITC are "charged" with administering different parts of the Act, it is Commerce who determines that a petition is sufficient to cause the initiation of

investigations—that the statutory requirements are satisfied. The ITC's position in its brief is that it defers to Commerce's initial determination, and that only Commerce can review that determination. This is a reasonable and permissible interpretation of the Act's delineation of respective responsibilities. We thus direct our comments at Commerce's role.

action begins at the opposite end of the spectrum from the issue in *Oregon Steel*, a case which could be read to support either outcome here. Although we reverse the decision of the Court of International Trade, our decision, too, is consistent with *Oregon Steel*.

In *Oregon Steel*, the court faced a situation in which Commerce, responding to a petition, initiated an investigation and later issued an antidumping duty order covering certain steel plate imports from Korea. The United States and Korea later entered into a Voluntary Restraint Agreement under which Korea agreed to import restrictions conditioned on revocation of the antidumping order. Commerce accordingly surveyed the domestic industry, and found that six of seven domestic producers of steel plate favored the Agreement over the antidumping order. Only Oregon Steel Mills, Inc., at that time known as Gilmore Steel Corp., continued to favor the antidumping duty order. *Oregon Steel*, 862 F.2d at 1542, 7 Fed.Cir.(T) at 23.

Commerce proceeded to revoke the antidumping order in light of the lack of industry support for its continued existence. Oregon Steel Mills appealed to the Court of International Trade, which ordered the reinstatement of the order. This court reversed, holding that "just as industry support underlies the merits of an order," Commerce may revoke an order for lack of industry support. *Oregon Steel*, 862 F.2d at 1545, 7 Fed.Cir.(T) at 27–28. The court noted that "[w]e do not need to define 'lack of support' with precision in this case. The lack of industry support here is overwhelming. Moreover, the industry is not simply indifferent, but has expressed a positive desire to eliminate the antidumping order in order to secure other benefits." *Oregon Steel*, 862 F.2d at 1545 n. 4, 7 Fed.Cir.(T) at 28 n. 4.

The present action is the obverse. As noted, the *Oregon Steel* court did not reach the issue of the quantification of lack of support needed to allow for revocation of a duty order, or, said another way, the quantification of support needed to prevent Commerce from refraining to initiate or continue an investigation or a duty order. In that case, as the court acknowledged, the lack of support was overwhelming; there was only minimal support. At most, *Oregon Steel* stands for the proposition that without a certain minimal level of support, Commerce may, but need not, revoke a duty order. The present appeal asks us a different question: what is the degree of industry support which must be shown before Commerce may act in response to a petition for initiation of an investigation pursuant to 19 U.S.C. § 1671a(b) or 1673a(b).

### 3.

■ There is nothing in sections 1671a(b) or 1673a(b) that answers the question. The statute cannot be said to give a clear answer, since it gives no answer. We must then decide if Commerce's interpretation is a permissible one.

Commerce can initiate a countervailing or antidumping duty investigation completely on its own, without any petition having been filed by an "interested party." 19 U.S.C. §§ 1671a(a), 1673a(a). Commerce need only determine, from information available to it, "that a formal investigation is warranted." 19 U.S.C. §§ 1671a(a); 1673a(a).

There is no indication whatever that the phrase "from information available to it" is to be given a narrower meaning than the plain meaning of the words—Commerce could use information made "available to it" by a petition filed by one who is *not* "an interested party," or by a petition filed by "an interested party" but not "on behalf of an industry." There is no requirement that Commerce had to acquire *on its own* the information leading to a self-started investigation, or that Commerce must ignore or cannot rely on information made available by a petition which may for some reason fall short of the statutory requirements for a petition-induced investigation. And there is clearly no suggestion that any conclusion must be made that a majority of the relevant domestic industry must support the self-initiated investigation.

Accordingly, Appellees do not, and could not reasonably, argue that absent industry support, Commerce's investigations must be nullified even had they been explicitly based on Commerce's power to self-initiate the investigations under sections 1671a(a) and 1673a(a). The only argument is that, Commerce having explicitly based initiation of its investigations on the submitted petitions under sections 1671a(b) and 1673a(b), those petitions must be found to be "on behalf of," i.e., affirmatively supported by a majority of, the domestic EC rod industry.

In our view, however, the statute lends itself to several possible interpretations, only one of which is suggested by Appellees. At one extreme, "on behalf of" could be interpreted as, rather than a standing requirement, simply a representational identity—a description of the role of the petitioner, and of the scope of any investigation and any ensuing remedy. At the other extreme, the statute could be interpreted as did the Court of International Trade, and as do Appellees—as a formalistic standing requirement. Before initiating any investigation in response to a petition, Commerce would have to determine that the petition is affirmatively supported by a majority of the domestic industry.

Commerce takes a middle position. As Commerce seems to apply the statute, the petition must be determined to have been filed "on behalf of" the domestic industry. However, Commerce reads the statute to give it broad discretion in making that determination. Commerce assumes that, as long as a petition is filed by an interested party, the filing is "on behalf of" the domestic industry unless and until Commerce determines otherwise. On the record before this court, it is not entirely clear whether Commerce construes "on behalf of" to be a standing requirement in the traditional sense, with a relaxed evidentiary showing, or merely a characterization of the nature of the petition, the satisfaction of which is left to Commerce's reasonable determination. The latter is the broader construction, and grants to Commerce the greater amount of discretion. If it is permissible, so too necessarily is the narrower construction. We thus assume, for the purposes of this analysis, that Commerce's position is the broader.

As we have previously explained, neither the statute nor the legislative history gives specific guidance on how Congress wished this issue to be decided. One thing Congress did make clear—Commerce has broad discretion in deciding when to pursue an investigation, and when to terminate one. The structure and purpose of the Act strongly suggest that any of the interpretations we have identified would be a permissible reading. The Court of International Trade erred in preferring its reasonable interpretation over that of Commerce's. *Chevron* teaches that, in the circumstances of this case, that is not the correct approach. Commerce's interpretation of its statutory power falls within the range of permissible construction; that ends our inquiry on this branch of the case.

4.

■ Appellees next argue that the statutory provisions should be interpreted to be consistent with the obligations of the United States as a signatory country of the GATT. Appellees argue that the legislative history of the statute demonstrates Congress's intent to comply with the GATT in formulating these provisions. Appellees refer also to a GATT panel—a group of experts convened under the GATT to resolve disputes—which "recently rejected [Commerce's] views on the meaning of 'on behalf of.' "

We reject this argument. First, the GATT panel itself acknowledged and declared that its examination and decision were limited in scope to the case before it. The panel also acknowledged that it was not faced with the issue of whether, even in the case before it, Commerce had acted in conformity with U.S. domestic legislation.

Second, even if we were convinced that Commerce's interpretation conflicts with the GATT, which we are not, the GATT is not controlling. While we acknowledge Congress's interest in complying with U.S. responsibilities under the GATT, we are

bound not by what we think Congress should or perhaps wanted to do, but by what Congress in fact did. The GATT does not trump domestic legislation; if the statutory provisions at issue here are inconsistent with the GATT, it is a matter for Congress and not this court to decide and remedy. *See* 19 U.S.C. § 2504(a); *Algoma Steel Corp. v. United States,* 865 F.2d 240, 242, 7 Fed.Cir.(T) 154, 156 (Fed.Cir.1989).

III. CONCLUSION

We reverse the judgment of the Court of International Trade, and remand for further proceedings consistent with this opinion.

COSTS

Each party is to bear its own costs.

REVERSED and REMANDED.