**Robert D. RAPAPORT, Petitioner,**

**v.**

**UNITED STATES DEPARTMENT OF the TREASURY, OFFICE OF THRIFT SUPERVISION, Respondent.**

**No. 93–1811.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 31, 1995.

Decided July 11, 1995.

Frank J. Eisenhart argued the cause for petitioner. With him on the briefs were Arthur W. Leibold, Jr., Neil R. Crowley, and Jeffrey D. Fisher.

Aaron B. Kahn, Counsel, Office of Thrift Supervision, argued the cause for respondent. With him on the brief were Thomas J. Segal, Deputy Chief Counsel, and Richard L. Rennert, Atty., Office of Thrift Supervision. Elizabeth R. Moore entered an appearance.

Before GINSBURG, RANDOLPH, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Opinion concurring in part and concurring in the judgment filed by Circuit Judge ROGERS.

GINSBURG, Circuit Judge:

Robert D. Rapaport was the majority shareholder of a savings and loan association that failed. Thereafter the Office of Thrift Supervision, as successor to the Federal Savings and Loan Insurance Corporation, ordered him to pay approximately $1.5 million pursuant to his agreement personally to maintain the capital in the institution at no less than the minimum required by regulation. We hold that because the OTS has not shown that Rapaport was "unjustly enriched," it may not enforce the agreement against him in an administrative (as opposed to judicial) proceeding. Accordingly, we grant Rapaport's petition for review and set aside the agency's order.

## I. Background

Great Life Savings Association of Sunrise, Florida, a state-chartered institution, applied to the FSLIC for deposit insurance in April 1984. While Great Life's application was pending, the Federal Home Loan Bank Board—the governing body of the FSLIC—promulgated a regulation requiring that any individual who owned 25% or more of the stock of a newly insured savings association "personally guarantee the maintenance of the association's net worth at the regulatorily required level." See 49 Fed.Reg. 41237, 41244 (Oct. 22, 1984), codified at 12 C.F.R. § 571.6(c)(4)(i) (1985). Accordingly, when the FHLBB approved Great Life's application, it did so upon the condition that Rapaport, who planned to purchase 74% of the Great Life's shares, enter into a Net Worth Maintenance Agreement with the FSLIC.

Rapaport ultimately purchased 69.9% of Great Life's stock. In March 1985 he entered into a five-year Agreement that provided:

[I]n consideration of the FSLIC granting insurance of accounts to the Association, the Acquiror agrees ... pursuant to the

requirements of 12 C.F.R. § 571.6(4), or any successor regulation thereto, to maintain the Association's net worth in compliance with the Net Worth Requirement applicable to the Association, computed in accordance with 12 C.F.R. § 563.13, or any successor regulation then in effect.

The FHLBB approved Great Life's insurance application and the thrift opened for business in May 1985.

Owing primarily to the number of non-performing commercial real estate loans on its books, Great Life, like many thrift institutions in the late 1980s, began to experience capital deficiencies. In November 1989 the OTS notified Rapaport that Great Life's capital was deficient by $152,000 and asked him to contribute $106,248 (69.9% of the total) pursuant to the Agreement. Rapaport responded that he was expending "great effort"—but not by actually contributing any capital—to improve Great Life's financial health. After further investigation, the OTS determined that Great Life's capital deficiency amounted to some $3.5 million as of December 31, 1989. In June 1990 the Resolution Trust Corporation was appointed receiver of Great Life, which has since been liquidated.

The OTS began an administrative proceeding against Rapaport in July 1990. In April 1993 an Administrative Law Judge found that: (1) Rapaport's role in the activities of Great Life "was limited solely to that of a stockholder"; (2) Rapaport was "unjustly enriched within the meaning of [12 U.S.C. § 1818(b)(6)(A)(i) ]" because he received the benefit of Great Life's having deposit insurance while retaining the capital he was supposed to contribute under the Agreement; and (3) under the Agreement Rapaport was obliged to contribute $1,946,000 to help cover Great Life's capital deficiency.

The Acting Director of the OTS affirmed the ALJ's decision, though he corrected it insofar as the ALJ had suggested that the benefit of insurance received by Great Life, rather than Rapaport's retention of what the Agreement allegedly required him to pay, was the basis for holding that Rapaport had been "unjustly enriched." (He also reduced Rapaport's liability to $1,536,675 based upon a revised valuation of one of Great Life's loans.) Like the ALJ, the Acting Director based his decision that Rapaport was liable for his unjust enrichment upon Rapaport's personal responsibility, as a stockholder, for Great Life's capital shortfall; he did not rely upon any role that Rapaport might have played in the management of Great Life.

Before this court Rapaport faults the Acting Director's decision in four respects. First, he claims that the OTS does not have statutory authority to bring this action against him. Instead, he submits that the Federal Deposit Insurance Corporation—as the manager of the FSLIC Resolution Fund—is the only agency (if any) that can pursue a claim based upon the Agreement. Second, Rapaport claims that the OTS failed to show that he was "unjustly enriched," as required by this court's decision in *Wachtel v. OTS*, 982 F.2d 581 (D.C.Cir.1993). If the court rejects his first two arguments, then Rapaport claims, third, that the Agreement expired in November 1989 when the regulation requiring such agreements was amended to exclude state-chartered institutions, and he is not responsible for any capital deficiency occurring thereafter. Finally, Rapaport claims that the OTS miscalculated Great Life's capital deficiency because it improperly valued certain loans.

## II. Analysis

Though we conclude that the OTS does have the authority administratively to enforce an agreement to which the FSLIC was a party, we also hold that the OTS failed in this case to make the required showing that Rapaport was "unjustly enriched." We therefore set aside the agency's decision without addressing Rapaport's last two arguments.

### A. OTS's Authority to Enforce the Agreement

Rapaport argues that if any federal agency has the authority to enforce the Agreement, it is the FDIC rather than the OTS. Section 1818(b)(1) of 12 U.S.C. authorizes "the appropriate Federal banking agency" to enforce any condition imposed "by the agency" or any agreement entered into "with

the agency." * The OTS cannot bring this action, according to Rapaport, because it was not "the agency" that entered into the Agreement, which was with the FSLIC (as opposed to the FHLBB, the governing body of the FSLIC). Further, because "all assets and liabilities of the [FSLIC]" were transferred to the FSLIC Resolution Fund, *see* 12 U.S.C. § 1821a(a)(2)(A), and the FSLIC Resolution Fund is managed by the FDIC, he claims that only the FDIC may proceed against him for any deficiency. *See also CityFed Financial Corp. v. OTS*, 58 F.3d 738 (D.C.Cir.1995) (holding OTS has jurisdiction to enforce cease and desist order against holding company affiliated with failed savings and loan).

Not so. Rapaport entered into the Agreement with the FSLIC, and when the Congress abolished the FSLIC and the FHLBB, *see* Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, § 401(a), 103 Stat. 183 (August 9, 1989) (FIRREA); *see also* Historical Note at 12 U.S.C.A. § 1437 (West Supp.1994), it also passed savings provisions stating that their abolition would "not affect the validity of any right, duty, or obligation" of those agencies. FIRREA § 401(f)–(g). Indeed, the Congress specifically provided that all "orders, resolutions, determinations, and regulations" of the FSLIC and of the FHLBB—which would include the regulations requiring and supporting the Agreement—"shall be enforceable by or against the Director of the [OTS], the [FDIC], the Federal Housing Finance Board, or the [RTC], as the case may be." FIRREA § 401(h). Hence, one of those four agencies must be able to enforce the Agreement.

Under 12 U.S.C. § 1818(b), it is "the appropriate Federal banking agency"—a defined term—that may institute proceedings requiring a party "to [ ] make restitution or provide reimbursement, indemnification, or guarantee against loss if [that] party was unjustly enriched in connection with [a] violation [of 'any law, rule, or regulation, or any condition imposed in writing by the agency in connection with the granting of any application or other request'] or [an unsafe or unsound banking] practice." 12 U.S.C. § 1818(b)(1), (6). "Appropriate Federal banking agency" is defined, "in the case of any savings and loan association," as "the Director of the [OTS]." 12 U.S.C. § 1813(q)(4) (also noting there may be more than one appropriate agency per case). The OTS is therefore the appropriate agency to enforce the Agreement between Rapaport and the FSLIC.

Moreover, the FIRREA provisions dealing with the powers and duties of the OTS provide specifically that: "[t]he Director [of the OTS] shall have all powers which [ ] were vested in the [FHLBB] (in the Board's capacity as such) ... and were not [ ] transferred to the [FDIC or another agency]." 12 U.S.C. § 1462a(e). Thus the FIRREA not only gives the OTS general authority to en-

---

* 12 U.S.C. § 1818(b)(1) provides:

If, in the opinion of the appropriate Federal banking agency, any insured depository institution, depository institution which has insured deposits, or any institution-affiliated party is engaging or has engaged, or the agency has reasonable cause to believe that the depository institution or any institution-affiliated party is about to engage, in an unsafe or unsound practice in conducting the business of such depository institution, or is violating or has violated, or the agency has reasonable cause to believe that the depository institution or any institution-affiliated party is about to violate, a law, rule, or regulation, or any condition imposed in writing by the agency in connection with the granting of any application or other request by the depository institution or any written agreement entered into with the agency, the agency may issue and serve upon the depository institution or such party a notice of charges in respect thereof. The notice shall contain a statement of the facts constituting the alleged violation or violations or the unsafe or unsound practice or practices, and shall fix a time and place at which a hearing will be held to determine whether an order to cease and desist therefrom should issue against the depository institution or the institution-affiliated party.... [I]f upon the record made at any such hearing, the agency shall find that any violation or unsafe or unsound practice specified in the notice of charges has been established, the agency may issue and serve upon the depository institution or the institution-affiliated party an order to cease and desist from any such violation or practice. Such order may, by provisions which may be mandatory or otherwise, require the depository institution or its institution-affiliated parties to cease and desist from the same, and, further, to take affirmative action to correct the conditions resulting from any such violation or practice.

force an agreement with a savings and loan, it also provides that the OTS succeeds to certain powers originally vested in the FHLBB and not transferred elsewhere.

Nonetheless Rapaport points out that the assets of the FSLIC were transferred to the FSLIC Resolution Fund, *see* 12 U.S.C. § 1821a(a)(2)(A), and that the FSLIC Resolution Fund is managed by the FDIC. From these facts he argues that the OTS is not authorized to enforce the Agreement, and is not in privity of contract with him. We disagree.

First, regardless of the enforcement authority of the FSLIC, the Agreement would certainly have been enforceable by the FHLBB, and as noted above, the OTS is the presumptive heir (via § 1462a(e)) to the powers of the FHLBB. Rapaport argues that the phrase "in the Board's capacity as such" in § 1462a(e) somehow precludes the OTS from exercising those powers held by the FHLBB in its capacity as director of the FSLIC, but we find no such negative implication in this affirmative grant of authority. Indeed, we take § 1462a(e) to mean just the opposite: powers vested in the FHLBB as the governing body of the FSLIC, including the power to enforce an agreement such as Rapaport's, may now be exercised by the OTS.

Second, we reject Rapaport's claim that the OTS is barred from enforcing the Agreement against him because it is not in privity of contract with him. This is not a suit for breach of contract and we express no view upon what would be required if it were; the OTS is here pursuing an administrative remedy and need only have some affirmative grant of authority to do so. That, as we have seen, it has.

**** 12 U.S.C. § 1818(b)(6) provides:

> The authority to issue an order under this subsection ... which requires an insured depository institution or any institution-affiliated party to take affirmative action to correct or remedy any conditions resulting from any violation or practice with respect to which such order is issued includes the authority to require such depository institution or such party to—

### B. Unjust enrichment

■ In order for the OTS to order a party to undertake any "affirmative action to correct conditions resulting from violations or practices," it must show either that the party has been "unjustly enriched" or that his conduct "involved a reckless disregard for the law or any applicable regulations or prior order of [a] Federal banking agency." 12 U.S.C. § 1818(b)(6)(A);** *see Wachtel v. OTS,* 982 F.2d 581, 586 (D.C.Cir.1993). The OTS's only theory throughout this case has been that Rapaport was "unjustly enriched," and therefore it must show as much before it can require him to pay a pro rata share of Great Life's capital deficiency.

The Acting Director's sole basis for concluding that Rapaport had, in fact, been unjustly enriched was simply that Rapaport "retain[ed] funds ... belong[ing] to [Great Life]"—i.e., the contested capital contribution—"while [Great Life] received the benefits of deposit insurance." Rapaport claims that this is insufficient to make out a case of unjust enrichment within the meaning of § 1818(b)(6)(A), and we agree.

■ As a preliminary matter, the OTS argues that we should defer to its construction of § 1818 under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We have already held in *Wachtel* that we owe no such deference to the OTS's interpretation of § 1818 because that agency shares responsibility for the administration of the statute with at least three other agencies. 982 F.2d at 585. The alternative would lay the groundwork for a regulatory regime in which either the same statute is interpreted differently by the several agencies or the one agency that happens to reach the courthouse first is allowed to fix the meaning of the text

> (A) make restitution or provide reimbursement, indemnification, or guarantee against loss if—
> (i) such depository institution or such party was unjustly enriched in connection with such violation or practice; or
> (ii) the violation or practice involved a reckless disregard for the law or any applicable regulations or prior order of the appropriate Federal banking agency;
> . . . .

for all. Neither outcome is unthinkable, of course, but neither has the OTS suggested any reason to believe that the congressional delegation of administrative authority contemplates such peculiar corollaries. *Cf. Bowen v. American Hospital Association,* 476 U.S. 610, 642 n. 30, 106 S.Ct. 2101, 2120 n. 30, 90 L.Ed.2d 584 (1986) (refusing to defer to agency's construction of Rehabilitation Act because "not the same basis for deference predicated on expertise" as in *Chevron); see also CF Industries, Inc. v. FERC,* 925 F.2d 476, 478 & n. 1 (D.C.Cir.1991) (dictum implying deference may be due when all agencies concerned "agree as to the which of them has exclusive jurisdiction"). Hence, we proceed de novo.

■■■ "Unjust enrichment" is a term of art at common law and we must presume that the Congress used it as such, *mutatis mutandis,* when it imported the term into the field of bank regulation. Turning to a commentary upon the common law, we learn that the fundamental characteristic of unjust enrichment is "that the defendant has been unjustly enriched by receiving something . . . that properly belongs to the plaintiff[, thereby] forcing restoration to the plaintiff." Dobbs, LAW OF REMEDIES § 4.1(2). The law of Florida is typical: The elements of a cause of action based upon unjust enrichment are that: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant accepted and retained the benefit; and (3) it would be unjust for the defendant not to pay the plaintiff the value of the benefit. *See, e.g., Hillman Construction Corp. v. Wainer,* 636 So.2d 576, 577 (Fla.App.1994).

The agency's argument that Rapaport was "unjustly enriched" by his failure to pay the amount he allegedly owed under the Agreement is deeply flawed, for it fails to satisfy even the first element of a claim for unjust enrichment. If Rapaport "benefitted" from his failure to contribute capital to Great Life—and that is at best an odd way to describe what happened—it was not because the OTS or its predecessor conferred something upon him. Nor did Rapaport profit from Great Life's continued operation because of anything that the agency did to shore up the institution. Rapaport just failed to pay up as allegedly required by his contract. A breach of contract might give rise to liability for damages measured by the loss to the plaintiff, but unjust enrichment simply does not lie when the plaintiff has not bestowed some sort of benefit upon the defendant.

At best, the FSLIC conferred an indirect benefit upon Rapaport in that it allowed him to own more than 25% of the shares in a federally insured institution (the direct beneficiary of the Agreement being Great Life). In other words, Rapaport got the opportunity to invest more than otherwise would have been allowed. (Ultimately, of course, his investment was worth nothing, but Rapaport's opportunity to invest was presumably of some value ex ante.) Nothing in either the ALJ's or the Acting Director's decision indicates that Rapaport received any other benefit from the FSLIC or from Great Life (at which he held no office).

There are two problems with the opportunity-to-invest-more concept of "benefit," however. First, it was not advanced in the decision of the OTS. Second, we doubt whether it would be sufficient in any event to establish that Rapaport was unjustly enriched.

■■■ Though the decisions of the ALJ and the Acting Director are somewhat opaque on the nature of the benefit, we know that they did not consider Rapaport's opportunity to invest more the benefit that he received because the OTS has maintained throughout this proceeding that the amount of the benefit to Rapaport is the amount that he would have had to contribute to Great Life had he complied with the Agreement to the agency's satisfaction. That amount, however, bears no relation whatever to the value to Rapaport of the FSLIC insuring Great Life's deposits, either at the outset or at the time of his alleged default. The $1.5 million Rapaport was allegedly required to contribute may arguably approximate the amount of the agency's loss attributable to Rapaport's alleged breach, but no principle in the law of restitution is more clear than this: "Restitution is measured by the defendant's unjust enrichment, not by the plaintiff's loss." Dobbs, RESTITUTION at § 4.5(1). The Acting Director actually paid lip service to this prin-

ciple, but he ignored it in fact when he concluded that Rapaport was "unjustly enriched" by retaining the money he allegedly should have paid in under the Agreement. That is the equivalent of saying that the defendant must cover the plaintiff's loss, lest the defendant's failure to do so enrich him. The argument is circular, hardly more than a play upon words.

What makes this case even harder to square with any recognizable notion of unjust enrichment is that Rapaport's alleged obligation to contribute more funds did not even arise until the value of Rapaport's right to hold stock in excess of 25 percent had become, for reasons not attributable to Rapaport himself, little more than the right to lose that much more money. Whatever the value of the opportunity that Rapaport received from the OTS in 1985, he had neither realized any benefit from nor even retained it as of late 1989, when the OTS came calling for more funds; there was by then simply no benefit that he could be required to disgorge. *See* RESTATEMENT OF RESTITUTION § 142, Comment *a* (1937) ("When events are such that a loss must be suffered by one of the parties ... justice does not require that the recipient should bear this loss where he is guilty of no greater fault than that of the claimant").

In short, the OTS has failed to demonstrate either that Rapaport was enriched or, if he was, why that enrichment was unjust. With only the Acting Director's *ipse dixit* to support the agency's claim, we see no reason to conclude that Rapaport was "unjustly enriched" by his failure to contribute capital to Great Life.

Even if we were to read the term "unjustly enriched" in § 1818(b)(6)(A) as having something other than its ordinary meaning at common law, our analysis in *Wachtel* of the history of the statute and of the related case law would lead us to the same conclusion. Prior to 1989, the law simply provided that the appropriate banking agency, after finding an unsafe or unsound practice or a violation of a law, rule, regulation, condition, or agreement could:

require [a party] to cease and desist from the same, and, further, to take affirmative action to correct the conditions resulting from any such violation or practice.

12 U.S.C. § 1818(b)(1) (1988). The Seventh Circuit, however, held that this provision did not give regulators "the authority to impose personal damages ... where there is no proof of personal enrichment." *Larimore v. Comptroller of the Currency,* 789 F.2d 1244, 1252 (7th Cir.1986) (en banc).

In *Larimore,* the directors of a bank had repeatedly approved loans in excess of the bank's statutory lending limit. *Id.* at 1246–47. The Comptroller argued that he could impose personal liability upon the directors in an administrative proceeding held pursuant to § 1818(b)(1). *Id.* at 1249. The court began its analysis by noting that under 12 U.S.C. § 93(a) the Comptroller was authorized to collect damages from a bank director only if the director's liability was "determined and adjudged by a proper district or Territorial court of the United States in a suit brought by the Comptroller of the Currency." *Id.* at 1248–49. The court concluded that "[t]o allow the Comptroller to have the power to assess personal liability and damages against a director [under § 1818(b)(1) ] without bringing his action in federal court would eviscerate the clear Congressional intent of 12 U.S.C. § 93(a) and 'would ... sanction administrative preemption of the statutory enforcement scheme designed by Congress.' " *Id.* at 1252 (quoting *Citizens State Bank of Marshfield, Mo. v. FDIC,* 751 F.2d 209, 217 (8th Cir.1984)).

The court did allow for an exception, however, upon the basis of the legislative history of the statute, "where an insider has unjustly enriched himself at the expense of the institution." *Larimore,* 789 F.2d at 1252 (quoting S.Rep. No. 95–323, 95th Cong., 1st Sess. 7 (1977)). Thus, while the usual course of action would be for the regulatory agency to proceed under § 93, the agency could use the administrative procedures of § 1818(b)(1) "in those cases where adequate relief cannot otherwise be obtained," and in no others. *Larimore,* 789 F.2d at 1253.

When the Congress passed the FIRREA a few years later, it took pains to clarify, in the wake of *Larimore,* when a bank regulatory

agency is able to hold a party personally liable in an administrative proceeding under § 1818. The amended § 1818 overruled *Larimore* insofar as it would have protected from administrative action an individual who had acted with reckless disregard for the law, but it also codified the exception in *Larimore* allowing the agency to bring an administrative proceeding against an individual who had not recklessly disregarded the law but had unjustly enriched himself (presumably at the expense of the institution). *See* H.Rep. No. 54, 101st Cong., 1st Sess. 468 (1989); S.Rep. No. 19, 101st Cong., 1st Sess. 40 (1989), U.S.Code Cong. & Admin.News 1989, pp. 86, 264.

We set out much of this same exegesis in *Wachtel.* There the OTS had failed to find even to its own satisfaction that the individual it held liable had been unjustly enriched. *Id.* at 583. The agency was reduced to arguing that it could support its order notwithstanding the straightforward requirements of § 1818(b)(1). Indeed, the precise holding of *Wachtel* is the same as the holding of *Larimore:* A banking agency may not impose personal liability under § 1818(b)(1) in a case that does not involve unjust enrichment. *Id.* at 583. What the OTS could not do in either *Larimore* or *Wachtel* under § 1818(b)(1), it certainly cannot do here under § 1818(b)(6)(A), which expressly requires that the party being charged have been unjustly enriched. Section 1818(b)(6) cannot make it any easier for the OTS to impose personal liability than it is under § 1818(b)(1), or the former provision would "eviscerate the clear Congressional intent" in the latter to require more, just as § 1818(b)(1) would have done to § 93(a) in *Larimore.*

Yet this is precisely what the OTS asks us to do. In *Larimore,* the directors of a bank had approved loans in violation of the law. This contributed to the bank's losses, but neither the court nor the Congress thought that the directors had been "unjustly enriched." *See* 789 F.2d at 1252 ("there is absolutely no proof of personal enrichment"); H.R.Rep. No. 54 at 468, U.S.Code Cong. & Admin.News 1989, p. 264 ("*Larimore* ... did not involve unjust enrichment"). Here Rapa-

port allegedly failed to abide by his Agreement to contribute capital; this might have contributed to (or at least accelerated) Great Life's insolvency, but it certainly did not enrich Rapaport.

In essence, the OTS would have us approve the administrative assessment of personal liability in every case where a party agrees, but ultimately fails, to maintain the required level of capital, regardless whether he gains personally from the operation of the institution. The Congress clearly contemplated something more than failing to uphold one's end of a contract when it required that a party have been "unjustly enriched" before he can be held personally liable in an administrative proceeding.

*Akin v. OTS,* 950 F.2d 1180 (5th Cir.1992), is not necessarily to the contrary. Akin, like Rapaport, had agreed to maintain the required level of capital at a thrift institution that ultimately failed. *Id.* at 1182. Unlike Rapaport, however, Akin had been the sole shareholder, President, Chief Executive Officer, and Chairman of the Board of the failed institution. *Id.* at 1181. Had Rapaport received the benefits of office as Akin did, he may well have been "unjustly enriched," at least to that extent, and that distinction may be enough to reconcile the two cases. *See* 12 U.S.C. § 1818(b)(6)(A) (party may be ordered to "make restitution or provide reimbursement, indemnification, or guarantee against loss" if unjustly enriched). We express no view on the Fifth Circuit's implicit conclusion that once a party has been unjustly enriched, he may be held liable for the institution's loss, i.e., for an amount in excess of his own enrichment.

To the extent that Akin's enrichment does not serve to reconcile these two cases, we respectfully disagree with the Fifth Circuit. Responding to Akin's claim that he had not been unjustly enriched, that court acknowledged that the OTS's position did not "dovetail[ ] neatly into a pattern of transfer of a benefit and restitution of that benefit from a party wrongfully retaining it," but it refused to require "a precision fit" between the OTS's position and "black letter contract law." *Id.* at 1184. Rather, the court thought that the terms of the particular provision

should be read broadly because the statute "[r]ead in its entirety ... manifests a purpose of granting broad authority to financial institution regulators." *Id.* Sometimes that follows, sometimes not. *Cf. Stomper v. Amalgamated Transit Union, Local 241,* 27 F.3d 316, 320 (7th Cir.1994) (Easterbrook, J.: "A court must determine not only the direction in which a law points but also how far to go in that direction"). In this context, a "broad" reading of § 1818(b)(6)(A) is in effect an unlimited reading of a statute upon which the Congress intended to place a limit. Having read out of the law the limitation that the Congress had put into it, the *Akin* court was remitted to relying upon the mere hope that the OTS would limit itself; hence the precatory dictum that "restitution orders should [not] become a remedy of choice for OTS." 950 F.2d at 1184 n. 5. Yet it is hard to see why that would not inevitably be the result of the Fifth Circuit's decision.

We are mindful that Rapaport made an agreement with the FSLIC that (unless his third argument is well-founded) he appears to have breached. Federal bank regulators are not without means to force a contract party to live up to his obligations, however. The Congress has simply made their "remedy of choice," to use the Fifth Circuit's phrase, a suit in district court under 12 U.S.C. § 93, where the safeguards and standards appurtenant to Article III courts apply. Only if Rapaport had been unjustly enriched—only if he had received and retained some personal benefit either from a federal regulator or from Great Life that he should in justice be required to disgorge—could the OTS force him onto the agency's own turf in order to exact restitution.

### III.   Conclusion

The OTS has the authority under the FIRREA to enforce a capital maintenance or other agreement in an administrative proceeding only against a party who has either been unjustly enriched or has acted with reckless disregard for some aspect of federal regulation. Rapaport's alleged failure to contribute as agreed in order to maintain

Great Life's required level of capital does not amount to such unjust enrichment. Accordingly, we grant his petition for review and set aside the agency's final order.

*So ordered.*

ROGERS, Circuit Judge, concurring in part and concurring in the judgment:

In rejecting OTS's contention that the court should defer to its construction of 12 U.S.C. § 1818(b)(6)(A)(i) under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the majority concludes that "[w]e have already held in *Wachtel* [*v. OTS,* 982 F.2d 581, 585 (D.C.Cir.1993),] that we owe no such deference to the OTS's interpretation of § 1818 because that agency shares responsibility for administration of the statute with at least three other agencies." Majority Opinion at 216. However, *Wachtel*'s suggestion that deference is inappropriate when more than one agency administers a statute was dictum that relied on distinguishable caselaw. The court has yet to decide the appropriate standard to review the OTS's construction of this provision of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") [1] pertaining to cease and desist orders, and the court need not do so here. As in *Wachtel,* the result is the same whether the court applies *de novo* review or *Chevron* deference. The statutory language and the legislative history demonstrate that Congress did not intend that retention of money allegedly owed pursuant to a net worth maintenance agreement, by itself, would constitute "unjust enrichment" under § 1818(b)(6)(A)(i).

In *Wachtel,* a bank holding company sought review of OTS's order, pursuant to § 1818(b)(1), to make payments based on an alleged agreement to maintain the bank's net worth. 982 F.2d at 582–83. Although finding neither unjust enrichment nor reckless disregard of banking laws, OTS maintained that it could order the holding company to make the payments under § 1818(b)(1) without making these findings.[2] *Id.* at 585. The

---

**1.**   Pub.L. No. 101–73, 103 Stat. 183 (codified in scattered sections of U.S.C.)

**2.**   OTS also argued that § 1818(b)(6)(A) was inapplicable "because the money it would extract

court rejected OTS's position as "almost frivolous," and proceeded to observe that even if *Chevron* deference were applicable, OTS's interpretation would fail because the statute was not ambiguous and OTS's interpretation was arbitrary. *Id.* While the court suggested that *Chevron* was inapplicable because OTS administered § 1818 jointly with other agencies, this was unnecessary to the court's holding that, under any standard of review, OTS's order was invalid. As dictum, the court's suggestion in *Wachtel* is not binding circuit law. *See, e.g., Gersman v. Group Health Ass'n, Inc.,* 975 F.2d 886, 897 (D.C.Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 1642, 128 L.Ed.2d 363 (1994).

Although the court has stated that it does not defer to an agency's construction of a statute interpreted by more than one agency, *e.g., Association of Am. Physicians & Surgeons, Inc. v. Clinton,* 997 F.2d 898, 913 (D.C.Cir.1993), the cases other than *Wachtel* itself appear readily distinguishable. For example, in *Clinton,* 997 F.2d at 913, which involved the Federal Advisory Committee Act, the court cited two cases involving statutes that apply to all agencies. *See FLRA v. United States Dep't of Treasury,* 884 F.2d 1446, 1451 (D.C.Cir.1989) (no deference to FLRA's interpretation of the Freedom of Information Act ("FOIA") and the Privacy Act because "the FLRA is not charged with a special duty to interpret" these statutes), *cert. denied,* 493 U.S. 1055, 110 S.Ct. 863, 107 L.Ed.2d 947 (1990); *Reporters Comm. for Freedom of the Press v. United States Dep't of Justice,* 816 F.2d 730, 734 (D.C.Cir.1987) (no deference to any agency interpretation of FOIA because "it applies to all government agencies, and thus no one executive branch entity is entrusted with its primary interpretation"), *rev'd on other grounds,* 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). Similarly, in *Wachtel,* the court relied on *Professional Reactor Operator Soc'y v. United States Nuclear Regulatory Comm'n,* 939 F.2d 1047, 1051 (D.C.Cir.1991), in which the court declined to defer to Commission's interpretation of the Administrative Procedure Act because the statute applies to all agencies and is not within the Commission's area

of expertise. Even more readily distinguished are cases in which the court has declined to defer to an agency's interpretation of a statute whose administration is entrusted to another agency. *E.g., Illinois Nat'l Guard v. FLRA,* 854 F.2d 1396, 1400 (D.C.Cir.1988); *Department of Treasury v. FLRA,* 837 F.2d 1163, 1167 (D.C.Cir.1988). At the same time, the court has acknowledged that where two agencies were charged with administering a statute, there "might well be a compelling case to afford deference if it were necessary for decision [where] both agencies agree as to which of them has exclusive jurisdiction." *CF Indus., Inc. v. FERC,* 925 F.2d 476, 478 n. 1 (D.C.Cir.1991) (dictum); *see also Suramerica de Aleaciones Laminadas, C.A. v. United States,* 966 F.2d 660, 665 n. 6 (Fed.Cir.1992).

Consequently, it appears too facile to conclude that deference is inappropriate simply because more than one agency is involved in administering a statute. The question of whether deference is due more likely depends on the nature of the statute and how Congress has decided it shall be administered. Under FIRREA, Congress provided for joint decisions among the several administering banking agencies on the allocation of transferred functions. FIRREA § 403(b)(1), 103 Stat. 183, 360–61 (1989) (codified at 12 U.S.C. § 1437 note). The statute instructs how to determine the "appropriate" entity for administering provisions of the statute. *See* 12 U.S.C. § 1813(q)(4) (the Director of OTS is the "appropriate Federal banking agency" "in the case of any savings association or any savings and loan holding company"). As is evident, Congress intended the several agencies that administer FIRREA to agree regarding their respective roles and exercise their expertise accordingly.

Thus, while *Wachtel* correctly reminds that consideration be given to the fact that more than one agency administers the statute, 982 F.2d at 585 n. 4, deference may nonetheless be appropriate where only expert banking agencies administer the statute and there is no disagreement among them about their respective responsibilities or the agency position under review. *See generally Pension*

from petitioners is not really restitution, reimbursement, indemnification, or guarantee against

loss." 982 F.2d at 585. Here, OTS seeks to recover from Rapaport under § 1818(b)(6)(A).

*Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 651–52, 110 S.Ct. 2668, 2678–79, 110 L.Ed.2d 579 (1990) ("[P]ractical agency expertise is one of the principal justifications behind *Chevron* deference."). Two circuits considering OTS's administration of the provision at issue here appear, at least implicitly, to agree. *Simpson v. OTS*, 29 F.3d 1418, 1425 (9th Cir.1994) (applying *Chevron* deference to OTS's definition of "reckless disregard for the law" under § 1818(b)(6)(A)(ii)), *cert. denied,* —— U.S. ——, 115 S.Ct. 1096, 130 L.Ed.2d 1064 (1995); *Akin v. OTS*, 950 F.2d 1180, 1184 (5th Cir.1992) (same, for interpretation of cease and desist power under § 1818(b), and applying "arbitrary and capricious"/abuse of discretion standard to OTS's determination that an individual had been "unjustly enriched" under § 1818(b)(6)(A)(i)). Another circuit has staked out a middle ground. *1185 Ave. of Ams. Assocs. v. RTC*, 22 F.3d 494, 497 (2d Cir.1994) (declining to give "full *Chevron* deference to the RTC's interpretation" of 12 U.S.C. § 1821(e) because several other agencies administer FIERRA).

The instant case does not require the court to decide whether *Chevron* deference should apply to OTS's interpretation of § 1818(b)(6)(A) because, as in *Wachtel,* the same result follows whether the court applies *de novo* review or *Chevron* deference. Even without reference to the common law definition of unjust enrichment, the legislative history indicates that Congress did not intend the phrase used in § 1818(b)(6)(A)(i) to encompass the retention of funds owed under a net worth maintenance agreement. *See* Majority Opinion at 218–19 (citing S.Rep. No. 19, 101st Cong., 1st Sess. 40 (1989); H.R.Rep. No. 54, 101st Cong., 1st Sess. 468 (1989); S.Rep. No. 323, 95th Cong., 1st Sess. 7 (1977)). Hence, OTS failed to prove that Rapaport was unjustly enriched.

Accordingly, notwithstanding the majority's interpretation of *Wachtel* and its observations regarding conditions for deference, *id.* at 216–17, I concur in granting the petition for review.